(No. 67893.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DARRYL REID, Appellee.

*Opinion filed April 18, 1990.*

28

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley and Cecil A. Partee, State's Attorneys, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Inge Fryklund, James E. Fitzgerald, Susan J. Crane and William D. Carroll, Assistant State's Attorneys, of counsel), for the People.

Michael J. Pelletier, Deputy Defender, and Karen Daniel, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee.

JUSTICE CALVO delivered the opinion of the court:

A jury found defendant, 15-year-old Darryl Reid, guilty of armed robbery and murder. Prior to trial, defendant moved to suppress two statements he made to the police and assistant State's Attorney. After a hearing, the circuit court of Cook County denied the motions and admitted the statements during the trial. The circuit court sentenced defendant to concurrent prison terms of 20 years for murder and 9 years for armed robbery. The appellate court, with one justice dissenting, reversed and remanded the cause for a new trial. (174 Ill. App. 3d

1009.) We granted the State's petition for leave to appeal (107 Ill. 2d R. 315(a)). Defendant has raised two issues on cross-appeal (107 Ill. 2d Rules 318(a), 343(b)(i)).

The State's case at trial consisted of, *inter alia*, defendant's two pretrial statements, and the testimony of several witnesses, including eyewitnesses, police detectives, police officers, a firearms examiner, a pathologist, a medical doctor and an assistant State's Attorney. Defendant called a school psychologist, Saul Levy, as a witness.

During the afternoon of July 26, 1984, defendant, Joanne Reid (defendant's sister), 14-year-old Joseph Brooks, and 18-year-old Robert Davis (Joanne's boyfriend), were in defendant's family's apartment. Brooks had a .22-caliber gun with him. In defendant's presence, Brooks and Davis discussed robbing a "pappy." Brooks and Davis informed defendant a "pappy" was an old man. Brooks gave Davis the gun and they, along with defendant, left the apartment.

The trio saw Herbert Madison, age 65, enter a nearby apartment building and they followed him in. Madison spoke with Gladys Drew at the doorway to her apartment. In the meantime, defendant and Brooks went across the hall, knocked on the door of an acquaintance, Michelle Matthews, and asked for a man named Nate, the brother of Matthews' girlfriend. Matthews advised them Nate was absent. In defendant's pretrial statements, defendant stated that before he left the apartment building, Davis and Brooks stopped and approached Madison just outside the building. Defendant then left the building and all three of them stood around Madison. Davis pointed the gun at Madison, and Brooks held an umbrella with both hands. At Davis' direction, defendant put his hand into one of Madison's pockets and found some change, but defendant did not remove the change. Davis then grabbed Madison's wallet, and

Davis and Madison struggled over it. During the struggle, Davis fatally shot Madison in the stomach. Davis told defendant to run, and the trio fled.

Defendant returned to his apartment and found Davis and Brooks there counting the money taken from Madison's wallet. Davis gave Brooks $13. Davis said that after he obtained change for a $20 bill he would also give defendant $13. Defendant, however, never received any money.

The police arrested defendant at his third-floor apartment later that afternoon. They found the gun and $13 in the apartment. They also recovered Madison's wallet and several pieces of Madison's identification from the ground and a windowsill just outside and directly below the apartment.

## I. Jury Question

The first issue raised by the State concerns a question the jury submitted to the circuit court during the jury's deliberations. The jury began deliberating at 5:40 p.m. on Thursday, May 16, 1985. The jury considered two charges—murder and armed robbery. Later that evening, the jury sent its first question to the circuit court. The jury asked whether it could find defendant guilty of one charge and not the other. The circuit court contacted both parties by telephone and everyone agreed to the circuit court's response. The circuit court told the jury to continue its deliberations on the basis of the instructions it had previously received. The circuit court subsequently sequestered the jury for the evening.

The jury continued its deliberations the next morning. During the day, the jury submitted a second, different question to the circuit court. After the circuit court and both parties discussed the circuit court's response to the second question, defense counsel asked the circuit court to directly answer the jury's first question:

"MR. BRADLEY [Defense Counsel]: *** This morning I was able to review the jury instructions, and perhaps it's my lack of diligence last night, or lateness of the hour, but I did not realize there was not a separate instruction in the pattern instructions. At that point—and I'm not saying that I did not agree to the procedure last night. But I think as we're going to answer one question that in your Honor's mind is clear and concise, we ought to answer the other question that was asked last night, which is very clear and succinct, and tell the jury they find him guilty of one charge and not guilty of the other.

MR. WARNICK [Assistant State's Attorney]: Obviously, your Honor, I would be opposed to that. I think at this time this is, since they have not sent that question, or renewed that question in any way after approximately eight hours of deliberation today, to send that accompanying their question which was just given would be in our view certainly a—could be interpreted by some members of the jury as pointing them to a decision or a conclusion one way or the other, which I think would be improper.

And I think that this is not now the time to do such a thing, and certainly counsel last night, it was totally in agreement by all parties as to the position, and that the Court did, and no objection, and I think to do so now would be improper."

The circuit court refused defense counsel's request, stating:

"Well, the question is no longer pending. It's been responded to, and it's been responded to based on the agreement of everyone that the jury should continue its deliberations.

What motivated that response from everyone will be difficult to determine.

Clearly the jury might have been asking whether or not they compromise by entering a guilty on one but not the other. That clarification could be detrimental to the position of either the State or the defense."

The jury asked two more questions, different from the first question, during the course of its deliberations.

The jury returned guilty verdicts on both counts at 6:37 p.m. on the second day of deliberations. During a post-trial hearing on defendant's motion for a new trial, one of the jurors testified that on the first day of deliberations the jury voted 11 to 1 to convict defendant of armed robbery. The next morning, the jury agreed to convict defendant of armed robbery, and began deliberating the murder charge. The jury initially voted 9 to 3 to acquit defendant of murder. By 6 p.m., the vote was 9 to 3 in favor of convicting defendant of murder.

The appellate court held that the circuit court committed reversible error by not explicitly answering the jury's first question. The appellate court held that even if defendant waived his objection to this error, it could address the issue under the plain error doctrine because the evidence in the "case was closely balanced, as the length of the jury's deliberations indicated." 174 Ill. App. 3d at 1014.

The appellate court then stated that although a circuit court may exercise its discretion and refrain from answering a jury's question, a circuit court has a duty to answer the question, if clarification is requested, the original instructions are incomplete, the jurors are manifestly confused, or the question concerns a point of law arising from the facts over which no doubt or confusion exists. In applying those principles to the facts before it, the appellate court held:

> "The jury manifested its confusion in this case when it asked the question, and the legal issue is clearly pertinent to this case. The jury had received no instruction explicitly stating that a finding of guilty on one count did not require a finding of guilty on the other count. The State contends that the original instructions were adequate to answer the jury's question because the trial court submitted four verdict forms: guilty and not guilty of murder, and guilty and not guilty of armed robbery. We believe that this is not an adequate substitute for an explicit re-

sponse to the jury's question. The State also argues that the trial court exercised its discretion properly because it could not have answered the jury's question without becoming involved in an extended discussion with the jury. We disagree. The trial court could readily have answered the question by stating that the jury could find defendant guilty on one count and not guilty on the other count. [Citation.] We find that the trial court erred when it failed to answer the jury's question of law arising from the facts of the case when the instructions previously given provided no direct answer to the question.

The State contends that evidence regarding the jury deliberations establishes that the error did not prejudice defendant. At a post-trial hearing a juror testified that after the jury had received the judge's response to its question, and after it had voted to convict defendant for armed robbery, on the first ballot the jury voted nine to three in favor of acquitting defendant on the murder charge. In the course of deliberations the nine votes for acquittal changed to votes for conviction. The voting shows that at least nine jurors initially thought that they could vote for acquittal on the murder charge even though they had voted for conviction for armed robbery. However, the evidence did not show how the nine jurors were persuaded to change their votes. If even one juror was swayed by confusion concerning the issue raised in the jury's question, the defendant's conviction was improper. We find that under the circumstances of this case, where the evidence was closely balanced, defendant has adequately shown that he was prejudiced by the trial court's refusal to answer the jury's question. Therefore, we reverse." (174 Ill. App. 3d at 1014-15.)

The appellate court, however, found the evidence at trial sufficient to find defendant guilty beyond a reasonable doubt of both crimes. Therefore, the appellate court remanded the cause for retrial.

The dissent concluded that the appellate court majority should not have considered the issue under the plain error doctrine because the evidence was not closely bal-

anced. In addressing the issue itself, the dissent contended the jury instructions were "complete and proper." (174 Ill. App. 3d at 1017 (McNamara, J., dissenting).) Therefore, "the giving of further instructions eight hours after the question had been posed could have been misconstrued by the jury." (174 Ill. App. 3d at 1017 (McNamara, J., dissenting).) The dissent pointed out that a circuit court has the discretion to answer or refuse to answer a jury question, and the circuit court in the case at bar did not abuse its discretion under the circumstances.

The State first argues that defendant waived any objection he had to the circuit court's response to the jury's question because he initially agreed to the circuit court's response when the jury posed the question. Only the next day, after the jury had deliberated eight hours more, did defendant object to the circuit court's response.

If a party fails to object at trial or to raise the issue in its post-trial motion, the party effectively waives the issue for appellate review. (*People v. Tannenbaum* (1980), 82 Ill. 2d 177, 180-81.) Where a defendant acquiesces in the circuit court's answer to the jury's question, the defendant cannot later complain that the circuit court abused its discretion. (*People v. Dunigan* (1981), 96 Ill. App. 3d 799, 828; *People v. Hooker* (1977), 54 Ill. App. 3d 53, 60-61; see *People v. Clark* (1972), 52 Ill. 2d 374, 391-92.) These waiver rules serve at least two purposes. First, timely objections allow the circuit court to promptly correct any error. (*People v. Roberts* (1979), 75 Ill. 2d 1, 11.) Second, a party who fails to object cannot obtain the advantage of receiving a reversal by failing to act. *Roberts*, 75 Ill. 2d at 11.

We hold that the circuit court did not abuse its discretion in either its first response to the jury, or when it

refused to change its answer upon defendant's subsequent objection.

Jurors are entitled to have their questions answered. (*Clark*, 52 Ill. 2d at 391.) A circuit court has a "duty to instruct the jury where clarification is requested, the original instructions are incomplete, and the jurors are manifestly confused." (*Gathings*, 99 Ill. App. 3d at 1138.) "Where a jury has raised an explicit question on a point of law arising from the facts over which there is doubt or confusion, the court should attempt to clarify the question in the minds of the jury members." (*People v. Jackson* (1980), 89 Ill. App. 3d 461, 479.) Under certain circumstances, a circuit court has the duty to answer a jury's questions even if the jury received proper instructions. *People v. Flynn* (1988), 172 Ill. App. 3d 318, 323.

Nevertheless, under the appropriate circumstances, a circuit court "may exercise its discretion to refrain from answering a jury's inquiries." (*Gathings*, 99 Ill. App. 3d at 1138.) A circuit court may decline to answer a jury's question if the jury instructions are "readily understandable and sufficiently explain the relevant law" (*People v. Palmer* (1982), 111 Ill. App. 3d 800, 807), "further instructions would serve no useful purpose" (*People v. Jones* (1976), 40 Ill. App. 3d 771, 774), further instructions would potentially mislead the jury (*Dunigan*, 96 Ill. App. 3d at 828-29), and the jury's inquiry involves a question of fact (*Hooker*, 54 Ill. App. 3d at 60). A circuit court may also refuse to answer an inquiry by a jury if an answer or explanation by the court would cause the court to express an opinion which would probably direct a verdict one way or the other. (*People v. Charles* (1977), 46 Ill. App. 3d 485, 489.) Furthermore, if the jury's question is ambiguous and any response to the question may require "a colloquy between the court and the jury, a further explanation of the facts, and perhaps an ex-

pression of the trial court's opinion on the evidence," the circuit court may refuse to answer the question. *People v. Tostado* (1981), 92 Ill. App. 3d 837, 839.

Both the State and defendant agree the jury received a full and complete set of instructions on the applicable law. The jury received Illinois Pattern Jury Instructions on, *inter alia*, the presumption of innocence (Illinois Pattern Jury Instructions, Criminal, No. 2.03 (2d ed. 1981) (hereinafter IPI Criminal 2d)), the definitions of legal accountability (IPI Criminal 2d Nos. 5.03, 5.06), and the definitions and elements of both murder (IPI Criminal 2d Nos. 7.01, 7.02) and armed robbery (IPI Criminal 2d Nos. 14.01, 14.02). The jury also received four verdict forms: (1) not guilty of murder, (2) guilty of murder, (3) not guilty of armed robbery, and (4) guilty of armed robbery. (IPI Criminal 2d Nos. 26.02, 26.05.) It is apparent the circuit court concluded that the instructions sufficiently apprised the jury of the applicable law. Thus, under the circumstances, the circuit court did not abuse its discretion by referring the jury to the written instructions.

When the jury asked the circuit court whether it could find defendant guilty of one crime and not the other, the circuit court consulted both parties and then told the jury to reach a verdict based on the instructions the jury had received. Defendant did not raise any objection to this answer until the following day after eight more hours of deliberation by the jury. The circuit court noted that it had already responded to the question upon the agreement of the parties. Because the circuit court had already answered the question differently earlier, had the circuit court changed its answer the following day when the jury had not reiterated the question, the jury may have been surprised and confused.

The circuit court also stated that the jurors might have been asking whether they could compromise the

verdict by finding defendant guilty of one charge and not the other. If so, the circuit court indicated that a direct answer could be "detrimental to the position of either the State or the defense." The circuit court thus implied that a direct answer might indicate a specific verdict to the jury, a verdict that would hurt both the State, which wanted a conviction on both charges, and the defendant, who wanted an acquittal on both charges. The circuit court did not abuse its discretion in considering these possible implications of its decision.

Contrary to the opinion of the appellate court, defendant has not adequately shown that the circuit court's failure to explicitly answer the jury's question prejudiced him. The appellate court found that after the jury received the circuit court's response to the question and after the jury had voted to convict defendant of armed robbery, the jury's first vote on the murder charge, which took place during the morning of the second day of deliberations, was 9 to 3 in favor of acquittal. Those nine jurors changed their votes to guilty by the end of the day. One possible reason the jurors changed their votes, according to the appellate court, was that they thought, or were persuaded to think, they had to find defendant guilty of murder because they had already found defendant guilty of armed robbery. It is equally true that the nine jurors might have changed their votes for some other, legitimate reason. Moreover, that nine jurors voted initially for acquittal of murder, after they had just voted for conviction of armed robbery, might mean they knew they could find defendant guilty of one charge and not the other. In any event, this discussion is all speculation, and speculation does not sufficiently prove the circuit court's action prejudiced defendant.

Defendant contends the evidence elicited by the juror during the post-trial hearing was incompetent, and

therefore we cannot consider it. We need not decide this issue, however, because we have already found that even if the juror's testimony was competent, we can only speculate as to what the testimony revealed about the jury's perceptions. Such speculation is insufficient in and of itself to show the presence or absence of prejudice to defendant.

According to defendant, part of the jury's confusion, and the reason it asked the question, stemmed from the written jury instructions. Based on the instruction on the elements of murder, the jury could have found defendant guilty under one of three alternative theories, including felony murder. In other words, under the felony murder theory, the jury could have found defendant guilty of murder if the defendant, or one for whose conduct defendant was legally accountable, performed the acts which caused the death of Madison, and such acts occurred during defendant's commission of armed robbery. Thus, defendant contends the jury could have erroneously concluded that it could not return different verdicts on the two charges. Although defendant does not dispute that the written jury instructions were complete, he argues that once the jury manifested confusion on the issue by asking the question, the circuit court had a duty to dispel the confusion by directly answering the question.

While the circuit court, within its discretion, could have directly answered the jury's question, the circuit court had no duty to do so under the circumstances of this case. As we indicated earlier, the jury received a complete set of written instructions. The circuit court apparently determined that the jury was not manifestly confused. The circuit court also apparently decided that the written instructions settled any confusion the jury displayed. For these reasons and for the other reasons we outlined above, we conclude the circuit court did not

abuse the exercise of its discretion in its response to the jury's question.

Defendant points out that the circuit court could have very simply and directly answered the jury's question "yes" without engaging in any extended discussion with the jury. In addition, the question concerned a point of law, rather than fact, so the circuit court could have answered it. (See *Jackson*, 89 Ill. App. 3d at 479; *Hooker*, 54 Ill. App. 3d at 60.) Defendant also contends he raised his objection at a reasonable point in the proceedings; that is, when the circuit court was considering another question by the jury. Moreover, none of the written instructions directly answered the jury's question. While the circuit court could have considered these factors in deciding whether to directly answer the question, these factors did not mandate a different response from the court.

We also find *Flynn*, 172 Ill. App. 2d 318, *People v. Morris* (1980), 81 Ill. App. 3d 288, and *People v. Brouder* (1988), 168 Ill. App. 3d 938, which defendant cites for support, distinguishable. While the appellate court in those cases reversed the defendants' convictions because the circuit courts did not properly answer the juries' questions, those cases have factual scenarios different from that of the case at bar.

Defendant also refers to *People v. Sanders* (1984), 127 Ill. App. 3d 471. In *Sanders,* a jury convicted defendant of armed robbery and murder. During deliberations, the jury asked the circuit court whether defendant, if found guilty of one charge, automatically could be found guilty of the other charge. After consultation with and upon agreement of both parties, the circuit court answered the jury: " '[Y]ou have two forms of verdict, "Guilty" and "Not Guilty" for each of the two charges. *You must select one of the two forms of verdict for each of the two charges.*' " (Emphasis in original.) (*Sanders,*

127 Ill. App. 3d at 473.) Defendant in *Sanders* argued on appeal that the circuit court's answer was unresponsive. The appellate court upheld the circuit court's action. The appellate court also held that defendant waived the issue because he did not object to the circuit court's response during trial and he failed to raise the issue in his motion for a new trial.

Defendant in the case at bar points to *Sanders* as an example of how the circuit court here could have appropriately answered the jury's question without engaging the jury in a lengthy discourse. We do not deny that the circuit court *could* have, within its discretion, and after consultation with the parties, answered the jury's question differently—either when the jury first posed the question or when defendant later raised the issue. Nevertheless, we must address the situation before us and decide whether the circuit court abused its discretion by handling the situation the way it did. For the reasons we have given, we conclude the circuit court did not abuse its discretion.

Defendant contends the circuit court's failure to explicitly answer the question prejudiced him because the evidence in the case was closely balanced. Defendant acknowledges the evidence revealed he was at the scene of the crimes. The close issue, according to defendant, was whether he was legally accountable for the offenses. He points out that he never took Madison's wallet and did not shoot Madison. Defendant notes that the jury deliberated about 14 hours over two days before rendering its verdict. Because the evidence was closely balanced, the answer to the jury's question played a significant role in the verdicts the jury reached, thus prejudicing defendant's case. The State, on the other hand, contends the evidence was overwhelmingly against defendant so no prejudice occurred. Even though the evidence may have

been closely balanced, we conclude defendant was not prejudiced for the reasons we have outlined above.

The State argues that the jury did not reiterate its question because the circuit court's answer satisfied the jury. Thus, the jury was able to determine the answer by looking at the written instructions again. Defendant refutes this argument by noting that the jury may not have repeated the question because it thought the effort would be futile. Once more, defendant points out that the instructions did not explicitly answer the question.

We agree with defendant. We cannot guess why the jury did not reiterate the question. More importantly, the jury need not re-ask the question for us to find error in the circuit court's response. As we have indicated, however, we do not find such error here or any prejudice to defendant.

## II. Burden of Proof

The second issue raised by the State concerns whether the circuit court incorrectly placed the burden of proof on defendant during the hearing on defendant's motions to suppress his two pretrial statements. In his motions and during the suppression hearing, defendant contended he did not knowingly and intelligently waive his constitutional *Miranda* rights because he could not understand the standard *Miranda* warnings. The circuit court denied defendant's motions. The appellate court, however, found that the circuit court improperly placed the burden of proof on defendant rather than on the State. Therefore, the appellate court remanded the cause to the circuit court for reconsideration of defendant's suppression motions based on the correct burden of proof.

The testimony at the suppression hearing revealed the following. The police arrested defendant at his home in the late afternoon on the date the murder and armed

robbery occurred. The police put defendant in a room at the police station. Defendant's mother arrived at the police station and was permitted to stay with defendant in the room. At approximately 6:45 p.m., Assistant State's Attorney Patricia DeOca spoke to defendant at the police station. Defendant's mother and Detective Edward Schmidt were also present during the conversation. DeOca testified she told defendant she was a lawyer and an assistant State's Attorney who worked with the police. Defendant testified she did not identify herself as an assistant State's Attorney; he thought she was a detective. DeOca indicated defendant responded affirmatively when she asked him if he understood she was not his attorney.

DeOca advised defendant of his constitutional rights, including: (1) he had a right to remain silent; (2) anything he said could be used against him in court; (3) he had a right to have his lawyer present during questioning; and (4) if he could not afford a lawyer, one would be appointed for him free of charge. DeOca also told defendant the State could prosecute him as an adult. According to DeOca, defendant stated he understood everything she had told him. Defendant testified he did not understand the rights DeOca read to him. Defendant stated he failed to tell DeOca he did not understand the rights because he was scared, he would have been embarrassed, he thought he had to talk to her or go to jail, and his mother told him to tell the truth.

At the hearing, defendant admitted he knew the meaning of the words "lawyer," "silent," "can," "will," "used," "against," and "present." Defendant also testified he did not understand what "attorney," "appoint," "represent," or "right" meant within the context of the *Miranda* warnings.

After DeOca spoke with defendant, she reduced his statement to writing. She read the statement to him and asked him to make whatever corrections he thought

were necessary. DeOca said she allowed defendant to read the statement himself. Defendant signed the last page and initialed each of the other pages of the statement. Defendant also signed a portion of the first page which listed the constitutional rights read to him. Defendant never indicated he wanted to remain silent.

At approximately 10:27 p.m. that same evening, DeOca and Schmidt, accompanied by Detective James Cassidy and a court reporter, returned to defendant's room. Defendant's mother was still there. DeOca again advised defendant of his constitutional rights and defendant indicated he understood those rights. Defendant then gave a court-reported statement. After the statement was typed, DeOca read it to defendant. Afterwards, defendant spent approximately 20 to 30 minutes reading the statement. DeOca asked defendant whether he wanted to correct any part of the statement and defendant declined. Defendant never stated he did not understand what DeOca told him; he gave responsive answers to her questions. Defendant signed the last page of the statement and initialed every page. Defendant testified he only read the first three pages and glanced through the other pages. DeOca, who had previously worked in juvenile court, found nothing unusual about defendant or his actions compared to other juvenile defendants, accused of similar crimes, whom she had handled.

Saul Levy, a school psychologist employed by the Chicago board of education, testified he administered tests to and evaluated defendant on March 15, 1984, four months prior to defendant's arrest. Defendant was referred to Levy because of defendant's underachievement and disruptiveness in class. Among the tests Levy gave defendant was the Wexler Intelligence Scale for Children (WISC). Defendant's full scale score was 78, which put defendant in the slow range; Levy classified defendant as a slow learner. The normal WISC range is 90 to 109.

Defendant's score on the WISC placed him in about the lowest ninth or tenth percentile, according to Levy.

Dr. Joseph Hahn, a psychologist and the administrator of programs at the Chicago board of education's bureau of child studies, testified. Hahn, who had evaluated about 2,000 children while with the board of education, was an expert in administering and interpreting psychological tests of school children. Hahn also supervised 193 school psychologists. Hahn testified concerning his evaluation of the results of Levy's psychological examination of defendant. Hahn stated that defendant had the reading and comprehension abilities of a third grade student or an eight-year-old. Hahn classified defendant as a slow learner. Hahn indicated the American Association of Mental Deficiency considers a person, like defendant, with a WISC score between 70 and 80 as mildly retarded. Based on his analysis, Hahn concluded defendant would not have comprehended or understood the standard four *Miranda* warnings he received.

Naomi Cartwright, a school psychologist with the Chicago board of education, testified she performed a psychological evaluation of defendant on December 18, 1984. The purpose of the evaluation was to determine defendant's level of functioning as required by the School Code for special education students. Cartwright gave defendant the Test of Non-Verbal Intelligence (TONI), a test developed for children with specific verbal, hearing, or language problems. The TONI does not indicate the extent of a child's vocabulary, or his or her understanding of the meanings of words. Defendant's score was in the 83 to 93 range. The average range is 85 to 115, and the below average range is 70 to 84. Defendant's score was in the lowest 21st percentile.

Cartwright also administered the Wide-Range Achievement Test to defendant. That test indicates at

what level a child pronounces words. Defendant scored at the fifth grade level.

A third test Cartwright gave defendant was the Monroe-Sherman Achievement Test, which tests a child's ability to understand paragraph meaning. Although the standardization of the test scores is based on a timed performance, Cartwright did not time defendant because she wanted to determine his highest level of performance. Defendant's score indicated he performed at the sixth grade level.

Finally, Cartwright admitted it was not unusual for a child of defendant's mental age to try to conceal his lack of knowledge or understanding out of embarrassment.

During the suppression hearing, defendant indicated he wished to amend his motion to allege, in addition, that as a result of physical and psychological coercion he made his statements involuntarily. The court stated, "I'll recess at this point, so we are sure where the burden of proof lies." The court subsequently allowed defendant to file an amended motion. At the close of all of the evidence, the circuit court stated:

> "In a sense, Mr. Bradley and Miss Domph [defendant's attorneys] have the burden of persuasion, even though there was an issue which suggested that perhaps they could argue the voluntariness issue that the State was assuming as part of the motion, I think, to quash the motion.
>
> I can say, based on the record before me that there, really, is no merit to that portion of the motion, so what is left is what was originally set forth in the motion, and that is the question of whether the defendant sufficiently understood the rights he allegedly waived at the time he made a statement to the police."

After considering all of the evidence, the circuit court denied defendant's motions to suppress.

The appellate court held that the circuit court improperly placed the burden of persuasion on defendant. The appellate court stated:

> "[D]efendant originally moved to suppress statements based on his inability to understand the *Miranda* warnings, and after cross-examination of defendant, defense counsel amended the motion to include allegations of physical coercion. In deciding the motion the trial court stated that defendant bore 'the burden of persuasion.' This was clearly incorrect: whenever the State seeks to introduce a confession into evidence, it bears the 'heavy burden [of] show[ing] that [the] defendant has waived his constitutional rights in a knowing, intelligent and voluntary manner.' [Citation.] The court qualified its misstatement, indicating that the State had the burden of persuasion on the second portion of the motion, regarding allegations of physical coercion. The court found that the State met its burden on that portion of the motion, as it stated: '[T]here, really, is no merit to that portion of the motion, so what is left is what was originally set forth in the motion, and that is the question of whether the defendant sufficiently understood the rights he allegedly waived ***.' In regard to this part of the motion, the court never rectified its misstatement of the burden of persuasion." (174 Ill. App. 3d at 1016-17.)

Because the appellate court had already remanded the cause for a new trial on other grounds, it held that upon remand, the circuit court had to "determine whether the State *** met its burden of proving that defendant made a knowing and intelligent waiver of his right to counsel." 174 Ill. App. 3d at 1017.

The dissent disagreed with the majority's holding on this issue. According to the dissent, once the State establishes its *prima facie* case that defendant's statements were voluntary, the burden shifts to the defense to produce evidence to rebut the State's case. The dissent also noted that the circuit court, in its discretion, can require a defendant to present his evidence first. (174 Ill. App. 3d

at 1022 (McNamara, J., dissenting).) Defendant did present his evidence first at the suppression hearing. The dissent contended: "[A] reasonable interpretation of the trial court's remarks *** is that the court merely referred to the burden of proof defendant carried following the evidence the State had produced regarding the entire waiver issue." (174 Ill. App. 3d at 1022.) Thus, the dissent did not think the circuit court misstated the law or that the conviction required reversal.

The State has the burden of proving, by a preponderance of the evidence, that defendant made a knowing, intelligent and voluntary waiver of his or her rights. (*Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628; *People v. Clark* (1986), 114 Ill. 2d 450, 457; *People v. Kincaid* (1981), 87 Ill. 2d 107, 116; *People v. Brownell* (1980), 79 Ill. 2d 508, 516.) Once the State has established its *prima facie* case, the burden shifts to defendant to show that his waiver was not knowing, intelligent or voluntary. (*People v. Davis* (1957), 10 Ill. 2d 430, 440; *People v. Cozzi* (1981), 93 Ill. App. 3d 94, 98.) The circuit court may, in its discretion, reverse the order of proof so that defendant presents his or her evidence first. *Davis*, 10 Ill. 2d at 440; *People v. Allen* (1986), 148 Ill. App. 3d 200, 203.

The State, like the dissent in the appellate court, contends the circuit court did not misstate the law. The circuit court, the State argues, simply referred to the burden of proof defendant bore after the State presented its evidence establishing that defendant knew and understood his rights before he waived them.

The State cites *Cozzi* as an analogous case. In *Cozzi*, defendant alleged the circuit court improperly placed the burden of proof on him during the suppression hearing. The circuit court in *Cozzi* stated during the hearing:

" 'Before I rule on your motion—your motion suggests the defendant was not admonished under *Miranda*.

Now, I will say you made no showing that was not done.

Also, that any proper waiver of rights under *Miranda* were not made voluntarily, knowingly, and intelligently.

You made no showing that occurred, and that all confessions, or statements, or admissions of the defendant were illicited [by] threat or coercion and that it was involuntary.

You made no showing on that, and for that reason your motion will be denied.' " (*Cozzi*, 93 Ill. App. 3d at 98.)

The *Cozzi* appellate court, however, held that the circuit court did not improperly place the burden of proof on defendant. The appellate court concluded that the circuit court merely referred to defendant's burden to rebut the State's evidence after the State presented its *prima facie* case. The State, according to the appellate court in *Cozzi*, fulfilled its burden by showing that defendant was advised of his rights, and that he failed to produce evidence to the contrary. (*Cozzi*, 93 Ill. App. 3d at 98.) In the case at bar, the State similarly contends the circuit court merely referred to defendant's burden once the State established its *prima facie* case; thus, no error occurred.

During oral arguments before this court, defendant agreed that the burden of production of evidence shifts from the State to the defendant during a hearing on whether the defendant knowingly, intelligently and voluntarily waived his rights. Defendant asserted, however, that the burden of *persuasion* always remains with the State. Because both parties had fulfilled their burden of production at the time the circuit court made its disputed remark, defendant argues that the circuit court said and *meant* "persuasion," and thus improperly placed the burden of *persuasion* on defendant.

Defendant also emphasizes that the circuit court qualified its burden-of-persuasion remark with regard to the voluntariness issue. The circuit court, however, did not make the same qualification with regard to whether defendant knowingly and intelligently waived his rights. Defendant thus concludes in his brief: "[T]he trial court believed the defense bore the burden of proof with respect to whether [defendant] 'sufficiently understood the rights he allegedly waived,' although possibly not with respect to the question of whether the statements were voluntary." The appellate court made the same point. (174 Ill. App. 3d at 1017.) Defendant notes that the appellate court required the circuit court, upon remand, to reevaluate only the issue of whether defendant knowingly and intelligently waived his rights, not the issue of voluntariness.

Defendant distinguishes *Cozzi* on the basis that the defendant in *Cozzi* presented no evidence to support his motion, whereas defendant in the case at bar presented such evidence. Moreover, in *Cozzi*, the circuit court stated that the defendant made "no showing" to support his claims. The circuit court in *Cozzi* did not specifically refer to the burden of proof as did the circuit court in the case at bar.

Defendant does not believe the circuit court placed the burden of proof on him simply because the parties presented their evidence in reverse order at the hearing. Defendant, however, contends that the order in which the evidence was presented may have confused the circuit court with regard to the burden of proof, and thus contributed to the error.

We conclude the circuit court did not improperly place the burden of proof on defendant at the suppression hearing. The comments by the circuit court at issue here are anything but clear. Nevertheless, we conclude the circuit court's comments referred to defendant's burden

after the State established its *prima facie* case. Defendant has an evidentiary obligation to rebut the State's *prima facie* case; this is the burden to which the circuit court referred. Consequently, we disagree with the appellate court's and defendant's interpretation of the circuit court's comments and hold that no error occurred.

## III. Suppression of the Pretrial Statements

Defendant argues on cross-appeal that, even if the circuit court applied the correct burden of proof, the circuit court should have suppressed his two pretrial statements because the State did not sufficiently prove he knowingly and intelligently waived his *Miranda* rights prior to giving the statements. Defendant contends he lacked the mental capacity to understand the *Miranda* warnings he received, and thus he could not have knowingly and intelligently waived his constitutional rights.

We initially note that the appellate court did not decide this issue. The circuit court, however, resolved this issue in the State's favor, the parties fully briefed and argued the issue, and a decision by us on the issue would serve the interest of judicial economy. Consequently, we will consider the issue for review. *Geary v. Dominick's Finer Foods, Inc.* (1989), 129 Ill. 2d 389, 408.

As we have already indicated, for a defendant's confession to be admitted at trial, the State must first prove the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. (*Miranda*, 384 U.S. at 475, 479, 16 L. Ed. 2d at 724, 726, 86 S. Ct. at 1628, 1630.) To establish a valid waiver, the State cannot simply rely on proof that the defendant received the *Miranda* warnings or gave a confession. (*Miranda*, 384 U.S. at 475, 16 L. Ed. 2d at 724, 86 S. Ct. at 1628.) In determining whether a defendant knowingly and intelligently waived his *Miranda* rights, a court must consider the totality of the circumstances, in-

cluding the characteristics of the defendant and the details of the interrogation, without any one circumstance or factor controlling. (*People v. Turner* (1973), 56 Ill. 2d 201, 205-07; *People v. Rogers* (1986), 141 Ill. App. 3d 374, 380; see *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 226, 36 L. Ed. 2d 854, 862, 93 S. Ct. 2041, 2047.)

> "*Miranda* is not a ritual of words to be recited by rote according to didactic niceties. What *Miranda* does require is meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act. \*\*\* The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights.

> It is, of course, always open to an accused to subjectively deny that he understood the precautionary warning and advice with respect to the assistance of counsel. When the issue is raised in an admissibility hearing, \*\*\* it is for the court to objectively determine whether in the circumstances of the case the words used were sufficient to convey the required warning." (*Coyote v. United States* (10th Cir. 1967), 380 F.2d 305, 308.)

We stated in *Turner*, 56 Ill. 2d at 205-06:

> "The purpose of advising an accused of his rights is to enable him to make an intelligent decision, and to understand the consequences of that decision, and the fact that the advice was iterated and reiterated, and that he said he understood it, is of little consequence unless the defendant was possessed of the intelligence to understand the admonition. \*\*\* In *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, the Supreme Court said: 'A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'

This court has long recognized that the mental capacity of a defendant must be taken into consideration in determining whether his actions were voluntary [citation] and while mental deficiency, of itself, does not render a confession involuntary [citation] it is a factor which must be considered in the totality of the circumstances under which the right to counsel was waived or a statement or confession made."

See *People v. Simmons* (1975), 60 Ill. 2d 173, 179-181.

The Supreme Court has similarly held:

"[T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel. \*\*\*

\*\*\* The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.* (1979), 442 U.S. 707, 724-25, 61 L. Ed. 2d 197, 212, 99 S. Ct. 2560, 2571-72.

The State must fulfill its burden by a preponderance of the evidence. (See *Clark*, 114 Ill. 2d at 457; *People v. Harper* (1967), 36 Ill. 2d 398, 402.) In reviewing a ruling on a motion to suppress, a reviewing court's analysis is limited; we must determine whether the circuit court's finding was against the manifest weight of the evidence. *Brownell*, 79 Ill. 2d at 521.

After hearing all of the evidence, the circuit court stated:

"The matter was set on for [defendant's] motion to suppress certain statements. The motion to suppress was predicated on the defendant's lack of sufficient intelli-

gence to understand the Miranda Warnings that were given to him. \*\*\*

\* \* \*

\*\*\* [W]e have had testimony from a psychologist employed by the Board of Education who said that it's doubtful that a person with an I.Q. in the mid 70's, what [defendant] is testified to have, with a fourth or at best a fifth grade achievement, would probably not understand the admonitions given to him.

The subject of I.Q. and level of intelligence or level of attainment has been considered by the Appellate Court in a number of cases. \*\*\* In those cases, what is instructive is that measurements are to be considered along with other facts and circumstances that are apparent to the Court in determining whether or not the defendant did understand the admonitions given to him.

In this case, I have the advantage of not only hearing the testimony of the doctor, but of hearing the defendant's testimony, Darryl Reid in court. The Court had the opportunity to observe his responses to questions, not only heard the responses but was able to see their effect. I can say that probably [defendant] is not the brightest young man of his age in the City of Chicago today.

That being said, looking at the circumstances and the interrogation which is not seriously refuted here, the defendant was admonished numbers of times regarding his rights. The statement was read to him and present during most of these proceedings was the defendant's mother who he was permitted to consult with from time to time outside the presence of the other officers.

I believe that the defendant sufficiently understood the proceedings that were taking place around him to be fully advised of his procedural rights pursuant to the Court's holdings in Miranda. Accordingly, the motion to suppress is denied."

Defendant asserts he did not knowingly and understandingly waive his rights for several reasons. First, Hahn's testimony revealed defendant had the reading and comprehension skills of an eight-year-old and could

not understand the *Miranda* warnings. Defendant argues that Cartwright's testimony did not contradict Hahn's conclusions. Cartwright admitted a child such as defendant would attempt to conceal his lack of knowledge out of embarrassment. Defendant contends Cartwright's tests failed to show whether he could understand the *Miranda* warnings. The TONI is a completely nonverbal test which, according to Cartwright's testimony, is not indicative of defendant's ability to understand the meanings of words. The other two tests given by Cartwright only tested defendant's pronunciation of words and his understanding of paragraph meaning. Although defendant scored at the sixth grade level on the latter test, the test was not timed and defendant spent more than the standard amount of time on it. Defendant also points out that Cartwright never testified as to whether defendant was capable of understanding the *Miranda* warnings.

Other factors buttressed defendant's inability to understand the *Miranda* warnings. Defendant lacked prior experience with the criminal justice system and therefore was unaware of his rights. Defendant had never worked and had always lived at home with his family. Defendant points out that reiteration of the standard *Miranda* warnings, on which the circuit court in the case at bar relied, did not aid defendant when his intellectual deficiency prevented him from understanding the warnings. The circuit court also relied on the presence of defendant's mother during the questioning. Defendant notes his mother was not an attorney, and the record fails to reflect that she attempted to explain the *Miranda* rights to him. Thus, defendant contends his mother did not help him understand his constitutional rights.

Defendant does not deny that he received the standard *Miranda* warnings more than once. Defendant also

does not deny he told the police and DeOca he understood those rights. Despite these circumstances, defendant argues he was nevertheless incapable of understanding the rights as explained to him.

Considering the totality of the circumstances, we conclude the circuit court's decision was not against the manifest weight of the evidence. Defendant was advised of his rights more than one time. He was advised of his rights both orally and in writing. Defendant had opportunities to tell authorities he did not understand the rights read to him. Defendant originally told the police and the assistant State's Attorney he understood the rights read to him. He gave both oral and written waivers of his rights. Only at the suppression hearing did defendant state he failed to understand those rights. DeOca, who had experience working with juveniles, testified she did not observe anything unusual about defendant or his actions. Hahn never met or spoke with defendant, and thus never discussed the *Miranda* rights with him. Defendant testified he understood the meaning of "lawyer," "silent," "can," "will," "used," "against," and "present," which are key words in the *Miranda* warnings. Although defendant's mother was not an attorney, she was present during defendant's questioning and defendant had an opportunity to speak with her outside the presence of the police and assistant State's Attorney. Thus, if defendant had a question concerning his rights, he could have expressed his concerns to his mother. In this way, defendant's risk of embarrassment was reduced.

While Hahn's testimony and defendant's lack of criminal experience are factors in defendant's favor, it is the circuit court's responsibility to judge the credibility of the witnesses, and to consider and weigh each of the factors. The circuit court heard defendant's testimony and observed defendant's demeanor on the stand. The record

clearly indicates the circuit court considered all of the relevant circumstances in the case at bar.

Courts have upheld the denial of the suppression of a defendant's statements under circumstances similar to those in the case at bar. (See *People v. Racanelli* (1985), 132 Ill. App. 3d 124; *People v. Clements* (1985), 135 Ill. App. 3d 1001.) We find the cases defendant cites for support, including *Turner*, 56 Ill. 2d at 201, *People v. Redmon* (1984), 127 Ill. App. 3d 342, and *People v. Baker* (1973), 9 Ill. App. 3d 654, distinguishable. Consequently, the circuit court's decision to deny defendant's motions to suppress his pretrial statements was not against the manifest weight of the evidence.

## IV. Sufficiency of the Evidence

Defendant also argues on cross-appeal that the State failed to prove he had the requisite intent to be legally accountable for armed robbery and murder. According to defendant, the State did not prove him guilty beyond a reasonable doubt (*In re Winship* (1970), 397 U.S. 358, 362, 25 L. Ed. 2d 368, 374, 90 S. Ct. 1068, 1071; *People v. Young* (1989), 128 Ill. 2d 1, 48); consequently, defendant concludes we should reverse his convictions.

A person is accountable for the conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1983, ch. 38, par. 5—2(c).) When a reviewing court is confronted with a challenge to the sufficiency of the evidence, the court must determine whether, " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *Young*, 128 Ill. 2d at 49, quoting *Jackson v. Virginia* (1979), 443

U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

The reviewing court must consider that the circuit court and the jury heard and saw the witnesses (*Young*, 128 Ill. 2d at 48), and thus were in the best position to judge the witnesses' credibility, to determine the weight to be accorded the witnesses' testimony, to decide the inferences to be drawn from the evidence, and to resolve any conflicts in the evidence (*Young*, 128 Ill. 2d at 51). A reviewing court must not substitute its judgment for that of the trier of fact on those issues, and should not reverse a conviction "unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." (Emphasis omitted.) *Young*, 128 Ill. 2d at 51.

Consent to or knowledge of the commission of a crime is not enough to constitute aiding or abetting the planning or commission of an offense. (*People v. Washington* (1970), 121 Ill. App. 2d 174, 181.) Mere presence of a defendant at the scene of the crime does not render him or her accountable for the offense. (*People v. Ruiz* (1982), 94 Ill. 2d 245, 256; *People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 10.) In addition, a defendant's presence at the scene of a crime, even when coupled with his or her flight from the scene, is not enough to prove accountability. (*People v. Lopez* (1979), 72 Ill. App. 3d 713, 716-17.) "Presence plus knowledge that a crime was being committed, without more, are [also] insufficient to establish accountability." *People v. Banks* (1975), 28 Ill. App. 3d 784, 786.

Nevertheless, "[a]ctive participation has never been a requirement for the imposition of criminal guilt upon the theory of accountability." (*Ruiz*, 94 Ill. 2d at 254.) Moreover, "[e]vidence of events occurring after the crime had been committed is competent to show participation in the crime itself." *Ruiz*, 94 Ill. 2d at 257.

" '[I]f the proof shows that a person was present at the commission of the crime without disapproving or opposing it, it is competent for the trier of fact to consider this conduct in connection with other circumstances and thereby reach a conclusion that such person assented to the commission of the crime, lent to it his countenance and approval and was thereby aiding and abetting the crime. [Citations.] Stated differently, circumstances may show there is a common design to do an unlawful act to which all assent, and whatever is done in furtherance of the design is the act of all, making each person guilty of the crime.' " (*People v. Morgan* (1977), 67 Ill. 2d 1, 9, quoting *People v. Washington* (1962), 26 Ill. 2d 207, 209.)

"[W]ords of agreement are not essential to establish a common purpose to commit a crime because the common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct." (*Ruckholdt*, 122 Ill. App. 3d at 10-11.) "[P]roof that the defendant was present during the perpetration of the offense, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors which the trier of fact may consider in determining the defendant's legal accountability." (*Ruckholdt*, 122 Ill. App. 3d at 11; *People v. Grice* (1980), 87 Ill. App. 3d 718, 725.) Defendant's flight from the scene may also be considered by the jury in determining whether defendant is accountable. *People v. Dotson* (1986), 143 Ill. App. 3d 135, 142.

Defendant contends the State did not prove he assisted or attempted to assist in either the planning or commission of the offenses. Defendant points out that only Davis and Brooks discussed robbing a "pappy," and only Davis and Brooks handled the gun. Davis and Brooks had to explain to defendant what "pappy" meant, and defendant merely followed Davis and Brooks out of defendant's apartment. Thus, defendant argues he

was not involved in the planning of the offenses; he merely had prior knowledge of the acts.

Defendant asserts that his actions during the commission of the offense also failed to prove his accountability. Defendant followed Brooks and Davis into the apartment building behind Madison. Defendant left the building after Brooks and Davis had already confronted Madison. Defendant only put his hand into Madison's pocket upon the instruction of Davis. Although defendant felt money in Madison's pocket, defendant did not remove the money. Davis had to take Madison's wallet. Davis shot Madison and told defendant to run. Defendant contends his presence at the scene, his knowledge of the crimes, and his flight from the scene are not enough to establish his accountability.

Defendant argues that his presence at the scene of the crimes was simply a continuation of his following the other two boys. Defendant, who was 4 feet 8 inches tall and weighed 70 pounds, also notes that he obeyed the instructions of Davis who was older (18 years old), larger (5 feet 11 inches tall and 160 pounds), and armed. Even the 14-year-old Brooks was taller (5 feet 2 inches tall) and heavier (125 pounds) than defendant. Defendant looked up to Davis because Davis was older and was defendant's older sister's boyfriend. According to defendant, although the evidence revealed he generally obeyed Davis' orders, the evidence did not show he wanted to further the commission of the offenses. Defendant never asked for and never received any of the money obtained from the robbery, although Davis told defendant after the commission of the crimes that defendant would receive $13. No evidence showed a bargain was struck before the commission of the crimes that defendant would receive, or knew he would receive, a part of the proceeds of the robbery.

Levy's testimony revealed defendant was mentally underdeveloped. Levy testified defendant had an intelligence quotient of 78 and a mental age of between 11 and 12 years. Defendant was a slower learner than other children of his age, according to Levy. Levy characterized defendant as passive, fearful, timid, lacking in confidence, and unable to reach out in his social relationships.

Because of his mental underdevelopment, defendant argues he was more likely to follow the group. Defendant contends he did not have the presence of mind or strength of character to resist the temptation to follow the other two boys and watch. Defendant agrees his behavior was irresponsible and unintelligent, but he emphasizes he did not intend to commit the offenses.

Although defendant's arguments are persuasive, we agree with the appellate court that the evidence at trial was sufficient to support defendant's convictions. As the appellate court pointed out:

> "[D]efendant saw Brooks give Davis a gun and he heard them discuss robbing an old man. He accompanied Davis and Brooks, and when they stopped Madison, defendant stood in front of Madison, partially blocking his way. Defendant reached into one of Madison's pockets when Davis told him to do so. After Davis shot Madison, defendant fled the scene, and when he, Davis and Brooks returned to his apartment, they agreed to split the proceeds three ways." (174 Ill. App. 3d at 1016.)

Defendant did nothing to discourage Brooks and Davis. At no time did defendant indicate disapproval of the commission of the crimes. He did not extricate himself from participating in the offenses. Not only was defendant present during the perpetration of the offenses, he maintained a close affiliation with Brooks and Davis after the commission of the crimes, failed to report the crimes, and fled the scene. Defendant's acts were voluntary. Thus, evidence of defendant's acts before, during

and after the commission of the offenses indicate a common design to do an unlawful act to which defendant assented. Words of agreement are not necessary to establish a common purpose to commit a crime. The common design can be inferred from the circumstances. Consequently, taking all of these circumstances into account, the jury could have concluded defendant was legally accountable for armed robbery and murder.

We have reached similar results in other cases. In *Morgan*, several people plotted to rob the victim. Defendant was present during this discussion, but told the others he would only accompany them; he would not participate and did not want any money. Defendant witnessed the fatal beating of the victim. Although he indicated he did not receive any money, defendant received part of the proceeds of the crimes, according to the testimony of one witness. We upheld defendant's convictions for armed robbery and murder on an accountability theory. We found that defendant's acquaintance with the participants in the crimes, his voluntary and deliberate presence at the scene of the crimes, his knowledge of the plot to rob the victim, a venture which contained a risk of violence, and the evidence that he received money from the crimes sufficiently supported defendant's convictions. *Morgan*, 67 Ill. 2d at 9; see also *People v. Hughes* (1962), 26 Ill. 2d 114.

The jury in the case at bar heard the testimony of Levy concerning defendant's psychological state. The jury had before it all of the conflicting evidence. Under the circumstances, and considering the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found defendant legally accountable for armed robbery and murder beyond a reasonable doubt. The evidence is not so unreasonable or improbable as to justify a reasonable doubt of defendant's guilt. Thus, we uphold the convictions.

For the foregoing reasons, we reverse the judgment of the appellate court and affirm the judgment of the circuit court. Defense counsel indicated during oral argument before this court that the appellate court did not address all of the issues presented before it because it reversed defendant's convictions for other reasons. Consequently, defense counsel asks that if we reverse the appellate court, we remand the cause to the appellate court for consideration of those issues the appellate court failed to resolve. We grant defense counsel's request and remand this cause to the appellate court for consideration of those issues raised by defendant, but not previously resolved by us or the appellate court.

*Appellate court reversed;*
*circuit court affirmed;*
*cause remanded.*