THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARCUS ROGERS, Defendant-Appellant.

First District (5th Division)   No. 1—95—1100

Opinion filed February 14, 1997.

Horvath & Lieber, of Chicago (Patrick C. Hess and Daniel V. Marsalli, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Colleen Reardon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HOFFMAN delivered the opinion of the court:

The defendant, Marcus Rogers, was charged by indictment with two counts of first degree murder. 720 ILCS 5/9—1(a)(1), (a)(2) (West 1994). After a bench trial, the circuit court found the defendant guilty of second degree murder and sentenced him to nine years' imprisonment. The defendant filed a timely appeal from his conviction and sentence. For the following reasons, we affirm.

The testimony at trial revealed that Lawrence O'Kray, who owned a two-flat building at 6741 S. Wabash, allowed Peter Greene to throw a party in the basement apartment of his building on April 16, 1993. O'Kray lived in the second-floor apartment.

Greene testified that he arrived at O'Kray's building on the morning of April 16 to set up stereo equipment for his party. Greene's party began around 8 p.m. At around 11 p.m. that evening, Andrae Carson was fatally shot near O'Kray's building.

Greene admitted that he belonged to a street gang but he did not believe the defendant was a member. According to Greene, several members of a rival street gang drove by O'Kray's building before the party began. He said that the victim, Andrae Carson, was a member of this rival gang.

Greene testified that he left the party early in the evening. When he returned at around 11 p.m., an ambulance and several police cars had blocked the street and a body was lying on the sidewalk. Greene said he went to Dennis Stigler's house for the rest of the night and the following day. He stated that Harold Ivy also stayed at Stigler's house that night and remained the next day. Ivy told Greene that he had been at the party when Carson was shot. Greene testified that Ivy was shot and wounded the day after Carson was shot.

According to Greene, he remained at Stigler's house for a couple of days until he learned that a warrant for his arrest had been issued in connection with the shooting of Carson. Greene turned himself in at the police station. He was questioned and placed in four lineups. The police told him he had been positively identified but then later released him, saying they had found someone else.

O'Kray testified that, at about 10 p.m. on April 16, he heard some voices on his back porch. He recognized one voice to be the defendant's. O'Kray heard someone say "did you hit him?" to which the defendant responded "I think so. I don't know." O'Kray said he did not know what the conversation was about. He did not recall ever

telling police officers that, after he heard gunshots, he went to his back porch and saw Greene, Ivy, and someone named Tony standing on his back porch. He also did not recall telling officers that he heard Ivy say "did you hit him?" and Tony responding "I don't know." O'Kray admitted he had a serious problem with alcohol and that he had been drinking on the night of the incident. O'Kray also testified that he sustained a head injury about a month after the shooting and, consequently, had suffered some memory loss.

William Payne testified that he arrived at the party around 8 p.m. to help Greene with the music. He said that the defendant was sitting behind him during the party for about an hour and a half. Later that evening, Ivy entered the apartment and shouted something. According to Payne, everyone at the party, including the defendant, started running for the back door.

Dwayne Esper testified that he attended the party with the defendant and Greg Washington. Esper said that Ivy entered the apartment at around 11 p.m. and told everyone to leave. Esper recalled that the defendant was with the "dee-jay" playing music when this occurred.

Darryl Preacely testified that he lived across the street from O'Kray's building. On the evening of April 16, 1993, he heard gunshots and went to his window. Preacely saw a man with a shiny object in his hand run across the street and get into a car. He did not see the man shoot anyone. Preacely also saw a body lying on the ground about 15 feet from where the man was running. He identified Greene in a lineup as the man he saw running to the car.

Gregory Washington testified that he and the defendant left the party a few times during the evening of April 16 but returned with another friend at around 11 p.m. Washington said he went outside for awhile and the defendant remained inside. Suddenly, while sitting in a car with a friend, Washington heard gunshots. Washington ran into the party and then joined the defendant and others running out the back door. On April 19, Washington and the defendant were picked up by the police for questioning. Washington said he was placed in two lineups, was told that he had been identified, but was released shortly thereafter.

Detective George Karl testified that his first interview with the defendant was on April 19, 1993, at about 5:15 p.m. According to Karl, the defendant stated that he left Greene's party for awhile and then decided to return. He told Karl that he heard gunshots on his way back to the party and quickly left the scene. After the defendant stood in a lineup, Karl had a second conversation with him. Karl said that the defendant admitted he had not told the truth during their

first interview and that he had actually been working "security" at the party for his street gang. The defendant told Karl that he had been instructed to pick up a gun on the back porch and watch for rival gang members. After he observed a black male walking through a gangway, the defendant grabbed the gun and walked through the party and out across the front yard of O'Kray's building. According to Karl, the defendant said that the black male stood about five feet from the defendant, removed a gun from his pocket, and shot at him. The defendant told Karl that he shot at the man three times and then ran back into the apartment.

Karl conducted a third interview with the defendant at 8:35 p.m. on April 19. Assistant State's Attorney Solita Pandit was present during this interview. According to Karl, after Pandit informed the defendant that no gun was recovered from the victim, the defendant substantially reiterated his story from the second interview but omitted any reference to the victim pulling out a gun or shooting at him. Instead, the defendant told Karl and Pandit that he shot three times in reaction to seeing the victim quickly remove his left hand from his sweatshirt pocket. Pandit wrote down the defendant's account of the incident, which he then read and signed. This statement was entered into evidence.

Ivy gave the police a written statement on April 19, 1993, in which he admitted that both he and the defendant were members of the same street gang. Ivy stated that he had acted as a "dee-jay" at Greene's party and the defendant had worked security for the gang. Ivy said that he heard gunshots and then saw someone lying on the ground. According to Ivy, the defendant later admitted to shooting Carson.

The defendant testified that three detectives came to his home on April 19, 1993, and he willingly accompanied them to the station to be questioned. When he was taken to an interview room, the officers allegedly asked "[w]hy did you shoot him?" The defendant said he denied shooting anyone. The defendant testified that he initially told the officers he left Greene's party for awhile and, upon returning, he heard gunshots and decided to go home. The defendant admitted at trial that he fabricated this story because he was afraid of being accused of the crime.

According to the defendant, the police placed him in two lineups and informed him that he had been identified. Thereafter, an officer told him that he would be released if he pleaded self-defense. The defendant agreed to do so. He said he told the officer that, after he saw a black male come from the alley and run through the gangway, he confronted the man near the front of O'Kray's building. When the

man pointed a gun at him, the defendant shot him. The defendant contended that he asked the officer if these acts constituted self-defense and the officer assured him that he would be released.

The defendant said that Assistant State's Attorney Pandit later read him his *Miranda* rights and asked him questions. He testified that he relayed the same self-defense story to Pandit that he had previously told the officers. The defendant recalled admitting to Pandit that he did not actually see Carson pull out a gun. Pandit wrote down what the defendant told her and he signed the statement.

At trial, the defendant was shown his signed statement indicating that he was a gang member working security at the party, that he saw a black male approaching him with his hands in his pockets, that the man quickly removed his left hand from his pocket, and that he shot the man three times. The defendant testified that the statement was untrue and that he had only signed it because the officers told him he would not go to jail if he admitted that he had shot Carson in self-defense. He further stated that the officers had suggested facts that he should include in his statement.

The defendant testified that he actually attended Greene's party that night, left a couple of times, and returned again around 10 p.m. According to the defendant, he was assisting with the music at the party when he heard gunshots. The defendant said he ducked down and ran towards the back door of the apartment with the other guests. He denied being a gang member and denied shooting Carson.

The trial judge found the defendant guilty of second degree murder and sentenced him to nine years' imprisonment.

■ On appeal, the defendant first contends that the trial court committed plain error in finding him guilty of second degree murder. The defendant argues that, since the indictment only charged him with first degree murder, and second degree murder is not a lesser included offense of first degree murder (see *People v. Jeffries*, 164 Ill. 2d 104, 122, 646 N.E.2d 587 (1995)), he was improperly convicted of a crime for which he was never charged. We disagree.

Our supreme court has held that second degree murder is first degree murder plus mitigation; thus, the elements of first and second degree murder are identical. *Jeffries*, 164 Ill. 2d at 122. Second degree murder differs from first degree murder only in the presence of a mitigating factor, such as an alleged provocation or an unreasonable belief in justification. *People v. Porter*, 168 Ill. 2d 201, 213, 659 N.E.2d 915 (1995). Accordingly, second degree murder is said to be, not a lesser included offense, but a lesser *mitigated* offense of first degree murder. *Jeffries*, 164 Ill. 2d at 122.

Section 9—2(c) of the Criminal Code of 1961 states in pertinent part:

> "When a defendant is on trial for first degree murder and evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder." 720 ILCS 5/9—2(c) (West 1994).

Thus, the clear language of section 9—2(c) of the Code provides that "[w]hen a defendant is on trial for first degree murder *** the defendant can be found guilty of second degree murder," regardless of the general rule that a defendant cannot be convicted of an uncharged offense that is not a lesser included offense of the crime charged in the indictment (see, *e.g., People v. Harris*, 146 Ill. App. 3d 632, 497 N.E.2d 177 (1986)). The trial judge need only determine that a mitigating factor, such as unreasonable belief in the necessity of self-defense, was proven based on the evidence as a whole.

Although the defendant denied any involvement in Carson's shooting, his signed statement indicated that he shot Carson three times because he erroneously believed Carson was about to pull out a gun. The trial court obviously found that the evidence supported a conviction of second degree murder "by way of unreasonable belief in self-defense."

■ The defendant next contends that the evidence was insufficient to convict him beyond a reasonable doubt. He claims that the record supports the conclusion that Greene, Ivy, and someone named "Tony" worked together to murder Carson. The defendant notes that Greene and Ivy were admitted members of a street gang and that Carson was known to be a member of a rival gang. In addition, the defendant argues that O'Kray initially said he saw Greene, Ivy, and Tony on the back porch and that O'Kray heard Ivy ask Tony "did you hit him?" to which Tony allegedly replied "I don't know." However, O'Kray testified at trial that it was the defendant on the back porch who answered "I think so. I don't know." In any case, the trial court determined that O'Kray was not a very credible witness because of his admitted alcohol abuse and head injury.

Moreover, the fact that Greene and Ivy stayed away from home after the shooting is not determinative of their involvement since such actions could indicate fear of retaliation from the rival gang or of being implicated in the shooting because of their presence at the party. While it is true that Greene was allegedly seen running with a shiny object in his hand and Ivy was shot the day after Carson's murder, these occurrences do not conclusively establish their involvement in Carson's murder.

The defendant further argues that he had an alibi since several

witnesses placed him inside the apartment when the shots were fired. However, Ivy told police that the defendant admitted to shooting Carson and the defendant's written statement reflects his involvement in detail. Thus, the trial court could properly choose to disregard the defendant's alibi.

The defendant next contends that his confession should be given less weight since the police promised he would be released if he pleaded self-defense. However, the record indicates that the defendant was not coerced into making a confession. He stated at trial that he was never threatened or harmed. In addition, the defendant admitted that Assistant State's Attorney Pandit read him the *Miranda* warnings and that he told her he understood them. Detective Karl testified in rebuttal that he never told the defendant that he could go home if he made a self-defense statement and never suggested that the defendant include certain facts in his statement. Karl also denied that the defendant ever said he wanted to call his mother. It was the trial court's prerogative to determine the credibility of witnesses and the weight to be accorded their testimony (*People v. Reid*, 136 Ill. 2d 27, 61, 554 N.E.2d 174 (1990)); thus, the trial court could properly accept the officer's version of the events.

The defendant also asserts that his confession was insufficiently corroborated since only O'Kray's unreliable testimony supported the defendant's signed statement. However, the record indicates that Ivy provided a written statement implicating the defendant in the shooting. Moreover, Karl and Pandit testified as to the defendant's varying accounts of the incident and his identification in the lineups. The defendant admitted at trial that he initially lied to the police. Accordingly, we hold the confession was sufficiently corroborated.

After viewing the evidence in the record in its light most favorable to the prosecution, we cannot say that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985). We conclude that sufficient evidence existed to support the defendant's conviction for second degree murder.

■ The defendant last contends that the trial court committed plain error when, in response to his request for a sentence of intensive probation, the trial judge responded: "Thank you, Mr. Rogers. It isn't ordinary, nor is it something that I had considered regarding sentencing because there's a death here."

The State contends that this argument was waived since the defendant failed to make a contemporaneous objection at the sentencing hearing and failed to include this issue in his post-trial motion. See *People v. McCleary*, 278 Ill. App. 3d 498, 501, 663 N.E.2d 22 (1996). We agree.

Section 5—8—1(c) of the Unified Code of Corrections was amended effective August 11, 1993, to state in pertinent part:

"A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed within 30 days following the imposition of sentence." 730 ILCS 5/5—8—1(c) (West 1994).

This court has repeatedly held that the amended statute creates a precondition for a defendant's appeal of sentencing issues. See *People v. Reed*, 282 Ill. App. 3d 278, 668 N.E.2d 51 (1996); *People v. McCleary*, 278 Ill. App. 3d 498, 663 N.E.2d 22 (1996); *People v. O'Neal*, 281 Ill. App. 3d 602, 667 N.E.2d 516 (1996). Since the defendant was sentenced on February 15, 1995, the amendment is clearly applicable. The record indicates that the defendant did not object either at the sentencing hearing or in his post-trial motion and, therefore, has waived this challenge.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County. As a result, we grant the State's request for $100 as its costs for defending this appeal (see *People v. Nicholls*, 71 Ill. 2d 166, 374 N.E.2d 194 (1978)) and $50 as its costs for oral argument (see *People v. Agnew*, 105 Ill. 2d 275, 473 N.E.2d 1319 (1985)).

Affirmed.

HARTMAN, P.J., and HOURIHANE, J., concur.