THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTWON WILLIAMS, Defendant-Appellant.

First District (1st Division)   No. 1—92—2549

Opinion filed May 16, 1994.

Rita A. Fry, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan R. Schierl, and Lorraine Scaduto, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Defendant Antwon Williams and codefendant Willie Wilson were charged with first-degree murder for the shooting death of decedent David Martin. A motion for severance was granted and defendant Williams was tried in a separate trial. A jury found defendant Williams guilty of first-degree murder under the theory of accountability. He was sentenced to 36 years' imprisonment. Now, he appeals his conviction and sentence.

Prior to trial, defendant moved to preclude various State's witnesses from testifying that they had been threatened and/or offered money to testify in a manner favorable to him. After hearing argument from both parties, the circuit court denied defendant's motion, reasoning that such testimony, if elicited, is relevant "to explain why a witness has changed his story."

At trial, Antoine Martin was the State's first witness. He testified that on July 30, 1990, while residing at 1701 West 59th Street, on the corner of 59th and Paulina, at about 10 p.m., he heard music in the street. He went to his open window and saw decedent walking with a radio on his shoulders. As Antoine was watching, a red Camaro he recognized as belonging to defendant rode up on the curb and stopped five feet from decedent. Antoine testified that he could not see the driver. He did, however, identify the passenger as Wilson. Wilson called decedent's name. Decedent turned around, bent down to put his radio on the ground, and as he was standing up, Wilson put one leg out of the car and shot decedent three times. While decedent was attempting to run to his house, Wilson got back into the car, and it sped away.

Antoine then ran out of his house after decedent. Decedent had gotten to his own porch and was lying there when he arrived. Antoine knocked on the door and waited until decedent's brother opened

it. When decedent's brother came out onto the porch, Antoine left, in order to retrieve decedent's radio. When Antoine brought the radio onto the porch, decedent's mother was present.

The State questioned Antoine about the morning following the shooting. Antoine admitted that he had spoken with Chicago police detectives McWeeny and Brennan the morning after decedent's death. At that time, he informed them that Wilson had shot decedent after stepping out of a red Camaro driven by defendant. Antoine further admitted that on August 4, 1990, he went to the police station and again told McWeeny and Brennan that Wilson was the shooter and defendant was the driver. He also identified a photo of defendant as being the driver.

Antoine additionally testified that he spoke with private investigator Michael Brinks. On December 4, 1991, Brinks, accompanied by a man introduced to him as Wilson's attorney, unexpectedly came to Antoine's home and recorded the conversation the three had. During the conversation, Antoine stated that he did not know who the driver or shooter was on the night decedent was killed.

Antoine also recalled that on December 30, 1991, Brinks came to his home again. This time, Brinks was accompanied by Eddie Sanders, a man Antoine knew to be a friend of defendant from the neighborhood. Antoine told them that he was not sure who the driver or shooter was when decedent was shot.

After giving the above testimony, Antoine admitted that he was presently afraid of giving the damaging testimony because his younger brother had been threatened as a result of Antoine's decision to be a witness for the State. His family had even moved twice since the shooting. In addition, he testified that he had been offered money by "Eddie Sander's [sic] on behalf of [defendant]." Defense counsel's objection to the answer was sustained and the jury was instructed to disregard it. Defense counsel then moved for a mistrial, which was denied. The circuit court allowed Antoine's testimony that he had been offered money by Eddie Sanders, who was the same Eddie Sanders who had been present when Antoine made the December 30 statement to Brinks. Antoine also testified that prior to meeting with Brinks he had been threatened.

On cross-examination, Antoine stated that he was not sure whether decedent had "gone for his socks" when he put down the radio, but that he did see a shiny object near decedent's socks. He additionally admitted that the day after decedent's killing, he, Jerome Dukes, decedent's brother Adam, and a few others met at Antoine's house. At approximately 9 a.m. that day, Adam and he found a gun near a tree. Antoine told Adam that he was not sure whether

or not decedent had a gun on the evening of the shooting. He admitted that he told Brinks that the gun was decedent's.

On redirect examination, Antoine testified that he did not know who owned the gun that was found the day after the shooting. He acknowledged that he did not tell the police that he had found the gun. Antoine further testified that he told Brinks and Wilson's attorney about a shiny object near decedent's socks after he and his family had been threatened. The threats were made after he had spoken with the police and had identified defendant and Wilson.

Decedent's mother, Judy Martin, testified at trial that at about 10 or 10:30 p.m. on the night her son was killed, she was on the telephone when she heard her son yelling for her from outside and a banging on the front door. She ran to the door, but her other son Adam had already opened it and found decedent lying on the porch bleeding from his chest. At that time only decedent and Adam were on the porch. She ran into the house, called the police and returned to the porch to ask decedent what had happened. Judy testified that decedent kept repeating that "Antwon did it" and mentioned a red car. She went back into the house to call the police again. By the time she arrived back on the porch, a crowd of neighbors had gathered. Antoine Martin, whom she knew, stepped forward, handed her decedent's radio and explained what had happened. He also mentioned a red car. An ambulance took decedent to the hospital, and when she arrived there, he was already dead.

Decedent's brother, Adam Martin, was the State's next witness. He testified that at about 10 p.m., while he sat watching television, he heard decedent screaming "mama, mama, I'm shot" and someone banging on the front door. When Adam opened the door, he saw decedent lying on the porch. Adam testified that when he asked who had shot him, decedent replied that " 'Twon, the one that drive [*sic*] the red car" shot him. Adam stated that he knew whom decedent meant, and identified defendant in court as " 'Twon."

Jerome Dukes, another witness for the State, testified that about 10 p.m., on the night of the shooting, he was watching television when he heard two shots. He ran out onto his front porch and saw decedent running toward decedent's own home. At that time, Dukes also saw defendant driving a red Camaro, which backed onto 59th Street and then sped away.

After seeing the above, Dukes ran down the street in order to ascertain what had happened to decedent. He heard Judy Martin ask decedent who had shot him. Decedent replied that it was "Antwon with the red car." While Dukes was standing on decedent's front porch, he saw the red Camaro drive past the house, coming from 59th Street.

Dukes additionally testified that on July 31, 1990, while at the Chicago police department, he informed Brennan and McWeeny that Wilson and defendant were inside the red Camaro when it drove by decedent's house after the shooting. He picked defendant's and Wilson's pictures out of a photo array.

Dukes then testified that he spoke with Brinks, who had come to the home of his child's mother in the company of Eddie Sanders. They took Dukes to the downtown office of defendant's attorney, Marvin Leavitt. While there, Dukes gave a sworn statement about the shooting to a court reporter. Sanders was not in the room when he gave the statement. Dukes testified that he was offered money by Sanders. Dukes knew that Sanders and defendant were friends.

On cross-examination, Dukes testified that on January 7, 1992, he made a sworn statement at attorney Leavitt's office. In that statement, Dukes swore that he had not been offered money or threatened and that he did not see who was in the red Camaro the night of the shooting. At trial, Leavitt asked Dukes whether he remembered being asked while in Leavitt's office, "It's your understanding that [decedent] also carried a gun, is that correct?" and responding, "yeah." Dukes denied giving that response and affirmatively stated that he said "As far as that's concerned everybody carry [sic] a gun. I carry a gun once in a while around that neighborhood you really need to know [sic]."

On redirect examination, Dukes testified that on January 7, 1992, he did not go to Leavitt's office on his own, but went there at the urging of Sanders. On that day, Sanders offered Dukes money. Dukes also stated that he never told police that decedent had a gun or "was going to his gun" on the night of the shooting.

At trial, there were several police officers who testified on behalf of the State. In pertinent part, the officers testified that the area of the shooting was lit by several streetlights the night of the murder and that the officers searched the area with flashlights, but failed to recover any weapons, casings or bullets.

Detective McWeeny took the stand. He testified that he began his investigation of decedent's shooting the day after it had happened. Dukes was the first witness to whom he spoke. Dukes informed him that decedent had said that Wilson had shot him. While Dukes was on decedent's front porch the night of the killing, he saw a red Camaro, driven by defendant with Wilson as a passenger, drive past the scene. In addition to speaking with Dukes, McWeeny presented a photo array to him. Dukes picked out photos of defendant and Wilson, as the driver of the red Camaro and the shooter, respectively.

McWeeny also spoke with Antoine Martin, whose testimony was

already recounted in this opinion. An array similar to the one shown Dukes was also shown to Antoine. He, too, chose the defendant's photo as that of the driver and Wilson's photo as that of the shooter. Detective Brennan's trial testimony corroborates McWeeny's, Antoine Martin's and Dukes' testimonies.

Officer Thome, another witness for the State, testified that on November 14, 1990, he and his partner received information that defendant and Wilson were at 5240 South Wolcott, an abandoned building. Thome, his partner and two other officers apprehended defendant and Wilson after a short chase. The men were placed under arrest and given their *Miranda* warnings. Defendant informed the officers that his 1983 red Camaro would be "stripped" if it was left in the area.

The State's last witness was Dr. Robert Kirschner, a deputy medical examiner, who conducted decedent's autopsy. He testified that decedent died as a result of a gunshot wound to the chest.

Defendant's first witness was Gail Schor, a law student at the time of the investigation into decedent's shooting. She testified that on January 7, 1992, she was employed by defense counsel Leavitt. She was present when Jerome Dukes' court-reported statement was taken. Schor testified that he was sworn by the court reporter and then began to answer defense counsel's questions. Dukes said that he had not been paid to come in and make the statement. Schor recalls Dukes stating that decedent owned a gun, which was found by a neighbor child the morning following the shooting. He also admitted that he did not hear decedent say that defendant had shot him. Instead, Dukes stated that he heard decedent call the name "Antwon" in the context of grabbing for a neighborhood child by that name.

Wendy Maslon also testified on behalf of defendant. On January 7, 1992, she was employed by defense counsel Leavitt as a court reporter. On that day, she administered an oath to Dukes and took his sworn statements. She testified that she made a true and accurate recording of Dukes' statements and remembers a series of questions and answers, the substance of which is essentially the same as that testified to by Schor.

After Maslon's testimony, the parties presented their closing arguments and the jury was instructed. Following deliberations, the jury returned a verdict of guilty of the charge of first-degree murder under the theory of accountability. Defendant was sentenced to 36 years in the department of corrections. Defendant appeals his conviction and sentence.

Defendant's first argument on appeal is that the State failed to

prove beyond a reasonable doubt that he was guilty of first-degree murder by virtue of the principle of accountability. We disagree with defendant and find that the State met its burden.

When presented with a challenge to the sufficiency of the evidence, it is not the function of a reviewing court to retry the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) Rather, the relevant question is whether, after reviewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Collins*, 106 Ill. 2d 237, 478 N.E.2d 267.) The resolution of a defendant's guilt or innocence depends on the credibility of the witnesses and the weight to be given their testimonies. It is well settled that the above determinations are exclusively within the province of the jury. *Collins*, 106 Ill. 2d 237, 478 N.E.2d 267.

A defendant is accountable for the actions of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1991, ch. 38, par. 5—2(c) (now 720 ILCS 5/5—2(c) (West 1992)).) Active participation in the offense is not a prerequisite to establishing accountability. (*People v. Ruiz* (1982), 94 Ill. 2d 245, 447 N.E.2d 148.) Evidence of events surrounding and following the commission of the crime is competent to show participation in the crime itself. (*Ruiz*, 94 Ill. 2d 245, 447 N.E.2d 148.) For example, proof that the defendant was present during the perpetration of the offense and did not oppose its commission, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors which the trier of fact may consider in determining the defendant's legal accountability. (*People v. Reid* (1990), 136 Ill. 2d 27, 554 N.E.2d 174.) A defendant's flight from the crime scene may also be considered when evaluating his participation in the offense. (*People v. Dotson* (1986), 143 Ill. App. 3d 135, 492 N.E.2d 903.) While mere presence at the crime scene or negative acquiescence in the commission of the crime, even coupled with flight from the scene, is not sufficient standing alone to find a defendant guilty under the accountability statute, other circumstances may be considered to show the defendant's participation. *Reid*, 136 Ill. 2d 27, 554 N.E.2d 174.

■ The evidence in the case at bar supports the conclusion that defendant's actions during and after the shooting of decedent rose to such a level that he was accountable for Wilson's conduct, and thus, guilty of first-degree murder. He drove Wilson to the crime scene, stopped the car, allowed Wilson to partially exit the vehicle, watched

him shoot decedent, then allowed Wilson time to get back into his car, and finally, sped away. After a crowd of neighbors had gathered on decedent's porch, defendant drove slowly past decedent's house. In addition, despite the fact that defendant was aware that the police were looking for him in furtherance of their investigation into decedent's shooting death, he never contacted them. Furthermore, when defendant was eventually arrested, he attempted to flee from the police making his arrest. Moreover, at the time of defendant's arrest, he was in the company of the shooter, Wilson. Defendant, thus, maintained his affiliation with Wilson months after decedent's shooting death.

Defendant inappropriately relies on *People v. Lopez* (1979), 72 Ill. App. 3d 713, 391 N.E.2d 105, and *People v. Taylor* (1993), 244 Ill. App. 3d 152, 614 N.E.2d 79, to support his argument that he was not sufficiently proven guilty by virtue of accountability. In *Lopez* and *Taylor*, the defendants were mere passengers in the car from which another shot someone. There was no evidence that those defendants in any way supplied any instrument of the crime. In stark contrast, defendant in the case at bar had complete control of a major instrument of the crime, the car. Defendant was able to stop the car a few feet away from decedent and provide a safe getaway for the shooter, Wilson.

This case, instead, is more factually similar to *People v. Rodriguez* (1993), 254 Ill. App. 3d 921, 627 N.E.2d 209. In *Rodriguez*, defendant was the driver of a car and his passenger shot and killed someone. In affirming defendant's conviction of first-degree murder under the accountability theory, the appellate court found significant the facts that the defendant drove slowly through the scene of the crime with his car headlights off, quickly fled the scene after the shooting and made no attempt to report the shooting to the police. In the instant case, defendant actually stopped his car and allowed the shooter to partially exit, waited while Wilson shot decedent and then allowed Wilson reentry into his car before speeding away. Accordingly, we find that there was sufficient evidence for a rational jury to find defendant guilty of first-degree murder under the theory of accountability.

Defendant's next argument on appeal is that the circuit court erred in admitting evidence that an eyewitness and his family had been threatened, offered money, were forced to move, and that he was afraid to testify, in addition to evidence that a second witness had also been offered money, which resulted in a violation of defendant's right to due process. Such evidence was properly admitted by the State to explain why certain witnesses may have

told different versions of the crime at bar at different times, not to show that defendant had committed other crimes.

A witness can be impeached by showing interest, bias, or an inclination to testify falsely. (*People v. Foley* (1982), 109 Ill. App. 3d 1010, 441 N.E.2d 655.) Evidence of witnesses' fears is also relevant and admissible where it tends to prove a material fact in issue and its probative value outweighs its prejudicial effect. (*People v. Eyler* (1989), 133 Ill. 2d 173, 549 N.E.2d 268.) The admission of evidence is within the sound discretion of the circuit court, and its ruling should not be reversed on review absent a clear showing of abuse of discretion. *People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696.

In the instant case, both Antoine Martin and Dukes had given conflicting statements as to whether or not they had actually seen defendant and Wilson in defendant's car at the time of the shooting. After testifying at trial concerning prior inconsistent statements he had made to defendant's private investigator, Brinks, Antoine testified that he was forced to move twice since his involvement in the case at bar, that his younger brother's life had been threatened and that he had been offered money for testimony favorable to defendant by Eddie Sanders, a known friend of defendant. Antoine added that as he presently testified, he was afraid.

■ The above testimony was relevant evidence to explain Antoine's statements to Brinks that he was not sure or did not know who was responsible for the shooting even though he had previously identified defendant and Wilson as the individuals responsible for decedent's death. It also offered a possible explanation for Antoine's testimony at trial that he did not see defendant driving the red car on the night of the shooting. Once Antoine and his family had been threatened, Antoine had motivation to give a version of the events that did not implicate defendant or Wilson. Dukes also testified regarding his inconsistent statements.

Testimony from State's witnesses that they feared for their own and their families' safety and were forced to relocate because they cooperated with the State was properly admitted to illustrate why the witnesses had given inconsistent statements. (*People v. Rainge* (1991), 211 Ill. App. 3d 432, 570 N.E.2d 431.) Moreover, it is of no consequence that the State used the prior inconsistent statement to impeach its own witness, Antoine, because it has a right to anticipate and deflect the impact of potential impeachment of its witness. (*People v. Soskins* (1984), 128 Ill. App. 3d 564, 470 N.E.2d 643.) The probative value of the evidence in question outweighs its prejudicial effect and was relevant to show why Dukes' and Antoine Martin's accounts of decedent's shooting had changes over the course of time. Thus, the

threats and offers of money to certain witnesses were properly admitted.

Defendant also argues that the State aggravated and amplified the prejudicial effect of the evidence of the threats and offers of money by referring to that evidence and drawing inferences therefrom during closing arguments. The propriety of the prosecution's remarks is left to the discretion of the trial court, and the trial court's ruling shall be upheld absent an abuse of discretion. (*People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324, 327.) The test for determining whether the remarks constitute reversible error is whether the remarks, considered in light of all the evidence, were a material factor in the conviction, or whether the jury might have reached a different result had the comments not been made. *People v. McCall* (1989), 190 Ill. App. 3d 483, 493, 546 N.E.2d 62, 68-69.

■ In his brief, defendant refers to several comments made by the prosecutor in closing argument; however, he refers to them out of context. It was clear that the remarks were intended to explain why Antoine Martin and Jerome Dukes gave different accounts to the police the day after the shooting than they gave to the private investigator and defense counsel almost a year and a half later. The threats were not attributed to defendant. At no time during the course of this argument did the prosecutor do anything more than argue the evidence presented at trial and the reasonable inferences drawn from that evidence. Notably, none of the now complained-of comments made during this portion of closing argument were ever objected to at trial.

Defendant next complains that Detectives Brennan's and McWeeny's testimonies regarding inconsistent statements made by Antoine Martin and Dukes concerning whether or not they saw who was driving the red Camaro the night of the shooting denied him a fair trial. The law is clear that a prior inconsistent statement may be admitted to impeach a witness if it is inconsistent with the witness' in-court testimony. (*People v. Williams* (1961), 22 Ill. 2d 498, 177 N.E.2d 100.) The State argues that the detectives' testimonies were properly admitted to impeach Antoine Martin's and Dukes' testimonies.

At trial, on direct examination, Antoine Martin testified that he saw defendant's car stop about five feet from decedent, directly under a streetlight. He further testified that when the car stopped, he recognized the passenger as Wilson, but could not see the driver. Antoine stated that he saw Wilson step out of the car and shoot decedent. On cross-examination, however, Antoine testified that he was not sure if Wilson shot decedent. Antoine's direct testimony re-

vealed that on the day following the shooting, he told police that he saw defendant driving the car when decedent was shot. He also testified that he spoke with private investigator Brinks and Wilson's attorney, during which he claimed that he did not know who the driver or shooter was.

Dukes' trial testimony was that when he initially saw defendant's car leave the scene of the shooting, he saw defendant driving, but that when the car drove back through the block and past decedent's house, he could not see the driver. Dukes further testified that on the day following the shooting, he told Detectives Brennan and McWeeny that he saw defendant inside the car when it drove by decedent's house. But, when speaking with private investigator Brinks, Dukes claimed that he did not see who was in the car on the night of the shooting.

As a general rule, a witness may not be rehabilitated by admitting former statements consistent with his trial testimony. (*People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.) An exception to this rule, however, applies when it is implied that a witness' testimony is recently fabricated, or that the witness had some motive to testify falsely. Under such circumstances, a prior consistent statement may be admitted if that statement was made before the motive to fabricate arose. (*People v. Powell* (1973), 53 Ill. 2d 465, 292 N.E.2d 409.) Thus, proof that the witness gave a similar account of the occurrence when the motive to lie was nonexistent or before the effect of the account could be foreseen makes the prior consistent statement admissible. (*Powell*, 53 Ill. 2d 465, 292 N.E.2d 409.) Furthermore, when a witness has been impeached by proof that he has made prior inconsistent statements, he may bring out all of the prior statements to qualify or explain the inconsistency and rehabilitate the witness. *People v. Hicks* (1963), 28 Ill. 2d 457, 192 N.E.2d 891.

■ There was evidence at trial that Dukes and Antoine Martin had been threatened, forced to move and offered money for testimony favorable to defendant. These threats and offers occurred subsequent to the witnesses' speaking with the police. We agree with the State, that in order for the jury to understand why the witnesses changed their stories, it must hear all of the evidence surrounding when and to whom statements were made. After reviewing the record, we find that the circuit court properly allowed testimony regarding Dukes' and Antoine Martin's inconsistent statements.

Defendant's last issue on appeal is that the circuit court abused its discretion in sentencing him by considering improper factors in aggravation and that his sentence is excessive. We disagree and uphold defendant's sentence.

A circuit court's decision with respect to sentencing is entitled to great deference and weight. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.) Absent an abuse of discretion by the circuit court, a sentence should not be altered on review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The circuit court is in a superior position from which to determine an appropriate disposition. (*People v. Lambrechts* (1977), 69 Ill. 2d 544, 372 N.E.2d 641.) It has an opportunity to consider many factors from which an appropriate sentence may be deduced such as a defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. A reviewing court, on the other hand, has only the "cold record." (*Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882.) We, therefore, cannot substitute our own judgment for that of the circuit court merely because we would have balanced the factors differently. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

The statutory penalty range for first-degree murder, as it existed at the time of the crime in the instant case, was from 20 to 60 years' imprisonment. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1 (now 730 ILCS 5/5—8—1 (West 1992)).) In determining what sentence to impose, the circuit court must examine several factors, including the nature of the crime, the need to protect society, and the rehabilitative potential of the defendant. *People v. Goodwin* (1991), 208 Ill. App. 3d 829, 567 N.E.2d 666.

■ In the case at bar, the circuit court stated that it considered all of the information in the presentence investigation, as well as what it heard in mitigation. The circuit court specifically mentioned most of the same mitigating factors which defendant asserts in this appeal as favoring a minimum term. Even though the circuit court also remarked that despite defendant's continued assertion that he "did not know what was going on," the totality of the evidence indicated otherwise, and there was no evidence that the circuit court imposed a more severe sentence because defendant denied involvement. As for the complaint that the circuit court improperly considered the fact that defendant was on bond for another offense, evidence that defendant was on bond at the time he committed the present offense can be considered by the court, as well as pending charges against defendant, as a factor in aggravation. (See *People v. Harris* (1991), 220 Ill. App. 3d 31, 580 N.E.2d 903; *People v. Bey* (1972), 51 Ill. 2d 262, 281 N.E.2d 638.) Nothing in the record indicates that the circuit court considered inappropriate factors in sentencing defendant. Rather, the record indicates that the circuit court considered all of the pertinent factors when determining the sentence to impose upon defendant. As to defendant's argument that his sentence is

excessive, the fact that a codefendant actually fired the fatal shot does not lessen a defendant's culpability when it is based on the theory of accountability. (*People v. Bell* (1981), 96 Ill. App. 3d 857, 421 N.E.2d 1351.) Accordingly, we uphold defendant's sentence.

For the foregoing reasons, the conviction and sentence of the circuit court of Cook County are affirmed.

Affirmed.

CAMPBELL, P.J., and O'CONNOR, J., concur.