Vincent BRUMLEY, Petitioner–Appellee,

v.

George E. DETELLA, Warden of
Stateville Correctional Center,
Respondent–Appellant.

No. 95–2612.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 6, 1995.

Decided May 8, 1996.

Jerold S. Solovy, Ada S. Cooper (argued), Ruth A. Bahe-Jachna, Jenner & Block, Chicago, IL, for Petitioner-Appellee.

Michael A. Hurst (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Respondent-Appellant.

Before BAUER and RIPPLE, Circuit Judges, and SKINNER, District Judge.*

RIPPLE, Circuit Judge.

█ On June 13, 1986, Allen Cypin was kidnapped and taken by gunpoint to a currency exchange where he was forced to cash a check. Despite his pleas, he then was killed by a gunshot to the head. Four years later, Vincent Brumley was convicted in Cook County Circuit Court of the murder, armed robbery and aggravated kidnapping of Allen Cypin. After unsuccessful direct appeals in the Illinois state courts, Mr. Brumley filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Northern District of Illinois. On June 23, 1995, the district court granted the writ on the ground that the evidence was insufficient as a matter of law to sustain Mr. Brumley's conviction. The Warden of Stateville Correctional Center, the appropriate party respondent, appeals the court's judgment. For the reasons set forth below, we reverse the judgment of the district court.

I

BACKGROUND

A. *Facts*

Sixteen months after the kidnapping, robbery and killing of Allen Cypin, three men were charged with the crimes and were tried separately. One of those individuals was Vincent Brumley. Mr. Brumley was convict-

---

* The Honorable Walter Jay Skinner, United States District Judge for the United States District Court of Massachusetts, sitting by designation.

ed under the Illinois accountability rule [1] for his aid in facilitating the commission of those crimes. He was sentenced to concurrent terms of fifty-five years for murder, thirty years for armed robbery, and fifteen years for aggravated kidnapping.

The evidence at trial established that the two other men charged, Steven Anderson and Lorne Gray, had carried out the criminal acts by holding a gun on Mr. Cypin and by forcing him into the car, into the currency exchange, and then out of the car to be killed execution-style. Mr. Cypin was found dead with a gunshot wound to the head; the police located his car a mile away. However, not until information was provided by witness Willie McCoy sixteen months later were the police able to gather sufficient evidence concerning these crimes. We set forth in the margin the more extensive factual summary provided by the state appellate court in *People v. Brumley*, 229 Ill.App.3d 16, 170 Ill.Dec. 771, 593 N.E.2d 660 (1992).[2]

1. The Illinois accountability rule provides that a defendant may be held criminally accountable for the conduct of another if

    (c) [e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.
    720 ILCS 5/5–2(c).

2. The Illinois Appellate Court summarized this evidence:

    Defendant, Vincent Brumley, and two co-defendants, Steven Anderson and Lorne Gray, were charged in a 22–count indictment and separate trials were conducted. Following a jury trial in the circuit court of Cook County, defendant was found guilty of murder, armed robbery, and aggravated kidnapping (Ill.Rev. Stat.1989, ch. 38, pars. 9–1, 18–2, 10–2). He was sentenced to concurrent terms of imprisonment of 55 years for murder, 30 years for armed robbery, and 15 years for aggravated kidnapping. . . .
    At trial, Derrick Hendrix testified that on June 13, 1986, he was driving home from work when he saw two men holding a gun on another man near the intersection of Roosevelt Road and 13th Street. He told a police officer about what he had seen and the two returned to the scene. No one remained at the scene nor were there any witnesses in the area. The officer later learned that a white car was seen speeding away from the parking lot.
    Stephanie Morgan, a clerk at the Kedzie–Ogden Currency Exchange, testified that on June 13, 1986, she received a telephone call regarding the type of identification needed to cash a check. Approximately 30 minutes later, the witness stated that a customer whom she identified as Allen Cypin (the victim), came into the exchange. She recognized the victim's voice as that of the same person who had called earlier about identification. The witness also stated that the victim was wearing a jacket, in spite of the heat. She further testified that the victim appeared to be frightened and nervous and was sweating. The witness further testified that while she was processing the check she noticed that a man was insistent upon standing closely behind the victim and that on three separate occasions she had to ask the man to step back. She stated that the man did not transact any business and that both men left the currency exchange at the same time.
    Detective James Mercurio testified that he found the victim's body and that it had a gunshot wound to the head. The victim's white car was recovered approximately 1 mile from where the body was found.
    Willie McCoy testified that he knew Gray, Anderson and defendant. He stated that he saw Gray in a white car in the parking lot near his apartment. He further stated that the police had asked him about the car because its owner had been murdered. The witness testified that he did not speak to the police because he was afraid.
    McCoy further testified that he did not see Gray again until about 16 months after the police first asked him about the white car. He stated that after seeing Gray again and completing a drug abuse program, he decided to inform the police about what he had seen. The witness identified Gray's photo and pointed out Gray's house. The witness agreed to testify provided the State relocate him.
    Detective Terrance Thedford testified that after speaking with Willie McCoy on October 14, 1987, he interviewed Gray. He further stated that as a result of his conversation with Gray he and his partner attempted to locate Steven Anderson and defendant. The witness stated that he interviewed Anderson and went to defendant's home where he interviewed defendant's mother. After returning to defendant's home a second time, defendant voluntarily accompanied the officer to the police station. Defendant and Anderson were placed under arrest. Defendant denied being involved in the homicide, even after being confronted with incriminating statements made by Gray. Several hours after being taken into custody, defendant made a court reported statement.
    Defendant stated that Anderson and Gray pulled up beside him in a white car in June of 1986. They asked him to get in the car and he

The evidence at trial that linked petitioner Brumley to the crimes came primarily from his two statements of October 23, 1987: the first, a statement to Detective Harrington in the police station interview room at 4:30 p.m.; and the second, a court-transcribed signed statement to Assistant State's Attorney Inge Fryklund made around 9:55 p.m.

Mr. Brumley described the events of June 13, 1986. He was walking down the street from his house around 9:30 p.m. Anderson and Gray drove up to him in a white sports car (a Pontiac Grand Am) and asked him to get in. Mr. Brumley got into the back seat of the car. Also in the back seat was a white man sitting behind the driver who appeared "like he was frantic, scared." Tr. 555. In his statement to Detective Harrington, Mr. Brumley described the man in the back seat as "balled up" on the floor of the car rather than sitting. He also stated in that statement that Anderson, who had a gun, said, "This white dude is going to give us some money." Tr. 523. After driving up Cicero and around the Rockwell projects, they stopped at a currency exchange. Gray, Anderson and the victim got out of the car and left the engine running; Mr. Brumley remained in the car. When the three men returned to the car about ten minutes later, Gray passed Anderson something, presumably money; Mr. Brumley stated that he did not see what was passed and did not receive any money.[3] They then drove to a lot along some railroad tracks in the area of Fillmore and Pulaski. Answering questions from the Assistant State's Attorney, Mr. Brumley continued:

Q. What did you do when you got there?

A. Well, us four got out of the car. They said, "Get out." And like I said, I stayed about 10 or 15 feet away from the car. I stood there, and was looking around, and then I heard a shot.

Q. Were you looking around to see if anybody else was coming?

A. Yes.

Q. What did you do when you heard the shot?

A. I turned around and looked, and Steve was standing over the man, and Lauren [4] was right there with him. Lauren was a little further, but Steve was standing over the guy.

Q. Steve was standing over the guy doing what?

A. He was standing over him looking at him.

Q. Where was the gun?

A. I guess he just put it away, and they ran.

Q. Did you see Steve holding the gun?

A. Yes, he had to.

Q. Did you see him holding the gun?

A. Yes.

got into the back seat. Defendant stated that there was a "man balled up" on the floor in the rear of the car. He stated that they drove around for awhile and then went to a currency exchange. Defendant stated that Anderson, Gray and the victim went into the currency exchange while he stayed in the car. Defendant stated that when they returned, Anderson gave Gray some money. He further stated that he did not receive any money. Anderson then drove the car to a lot near some railroad tracks. He saw Anderson with the gun standing over the victim and heard a gunshot. Defendant stated that he ran when he heard the shot.

Assistant State's Attorney Inge Fryklund testified that she interviewed defendant for approximately 20 minutes on October 23, 1987. The witness stated that near the end of the interview she asked defendant if he was surprised to be arrested 18 months after the event. The witness stated that he said, "Yes, I thought we got away with it."

The jury found defendant guilty of murder, aggravated kidnapping and armed robbery. At the sentencing hearing, the State asked the court to consider hearsay statements of Gray and Anderson which indicated that defendant shared in the proceeds of the cashed payroll check and that defendant had been active in controlling the victim while in the back seat of the car. The court found the acts in this case to be exceptionally cruel and sentenced defendant to concurrent terms of imprisonment of 55 years for murder, 30 years for armed robbery and 15 years for aggravated kidnapping. *People v. Brumley,* 170 Ill.Dec. at 772–73, 593 N.E.2d at 661–62.

3. Mr. Brumley told Detective Harrington that he saw Gray give Anderson some money and then heard him ask, "What are we going to do with this guy?" The victim pleaded that they not hurt him. Tr. 524.

4. In the transcript testimony the court reporter wrote "Lauren" rather than "Lorne."

Q. After the shot was fired, what was the White guy doing?

A. He fell. He fell and hit the ground. That's when I ran. That's when I took off and ran.

Q. What did Lauren and Steve do?

A. They ran the other direction. They split up from each other. They separated.

Tr. 557–58.[5] Mr. Brumley signed the statement and the Assistant State's Attorney then asked petitioner if he was surprised to be arrested eighteen months after the events. According to her unrebutted testimony, he replied, "Yes, I thought we got away with it." Tr. 529.

B. *Procedural History*

Following a jury trial, on July 6, 1990, Mr. Brumley was convicted of murder, armed robbery and aggravated kidnapping in the Circuit Court of Cook County. His conviction was affirmed by the Illinois Appellate Court; his petition for leave to appeal to the Illinois Supreme Court was denied. Mr. Brumley's direct appeal alleged that the trial court erred in admitting evidence outside the record at the suppression and sentencing hearings and in refusing to give the defendant's proposed accountability instruction. It also challenged the State's use of improper statements during closing argument. Notably, it did not challenge the sufficiency of evidence against Mr. Brumley.

Mr. Brumley did not seek post-conviction relief in state court. His petition for habeas relief in federal court raised, for the first time, the claim that he was not proved guilty beyond a reasonable doubt of the crimes under a theory of accountability. The district court requested additional briefing on the issues of Mr. Brumley's procedural default and the merits of his claim. With new court-appointed counsel, Mr. Brumley argued

that the evidence at trial was constitutionally insufficient[6] and that he had received ineffective assistance of appellate counsel in his direct appeals. Mr. Brumley's ineffective assistance of counsel claim was twofold: First, his appellate counsel did not challenge the sufficiency of the evidence presented against Mr. Brumley; second, when the direct appeals failed, he did not advise Mr. Brumley that he could bring state court post-conviction proceedings.

On June 23, 1995, the district court granted the petition, issued the writ and ordered Mr. Brumley's immediate release.[7] *Brumley v. Godinez*, No. 93 C 4817, 1995 WL 382492, at *5 (N.D.Ill. June 23, 1995). The court, considering the evidence at trial against Mr. Brumley, was "of the view that the evidence shows nothing more than Brumley's presence at the scene, and under Illinois law this is insufficient for criminal accountability, even when coupled with flight." *Id.* at *1 (citing *People v. Reid*, 136 Ill.2d 27, 143 Ill.Dec. 239, 255, 554 N.E.2d 174, 190 (1990)). According to the court, under Illinois case law some act that reflects more than mere presence and more than failure to assist the victim or flight from the scene is required.

> [J]ust as a defendant's mere presence does not establish his intent to participate or assist in the crime, neither do any of the other factors, such as failure to assist, flight, or failure to report the crime. There must be something more, some affirmative act by the defendant by which he evidences an intent to facilitate the crime.

*Id.* at *2 (citing *Reid* and *People v. Tinoco*, 185 Ill.App.3d 816, 133 Ill.Dec. 760, 541 N.E.2d 1198 (1989)). The court applied the analysis to this case:

> Here, Brumley was merely present and did nothing to assist the other defendants.

**5.** Detective Harrington's testimony concerning Mr. Brumley's description of the murder reflects a slightly different picture.

> Anderson was in possession of the black colored gun, and Brumley indicated that he began to walk westward through the alley although he was looking around. He indicated as he was walking, he heard one shot. He turned around, and he saw Steven Anderson standing over the victim who was now laying on the ground. Steven Anderson still had the

gun in his hand. He indicated that he went to Roosevelt Road, and then ran home.

Tr. 525.

**6.** Mr. Brumley also challenged the court's refusal to modify the jury instruction on accountability.

**7.** The district court later stayed the writ pending appeal and stayed the petitioner's release on bond.

As far as Brumley's conviction for kidnapping is concerned, there is no evidence that he was even present when the victim was kidnapped. The only evidence in the case is to the effect that the victim was already "balled up" on the floor of the car when Brumley entered the car and first saw him. Although Brumley was "present" at the robbery and the murder, it is perhaps more accurate to say that he was nearby, sitting in the car, when the money was obtained at the currency exchange and later when he heard a shot while one of the other defendants was standing over the victim in a vacant lot. There is no evidence that he did anything to assist either the robbery or the murder. Had he never entered the car that day, there is no reason to believe the robbery and the murder would not have occurred just as they did.

The court concludes, therefore, that the failure of Brumley's appellate counsel to raise the insufficiency of the evidence on his appeal was a failure to raise a point that could well have resulted in the reversal of his conviction. In fact, this court is unable to see how the result could have been anything other than a reversal. Petitioner has satisfied the requirement that he show "a reasonable probability" that had he appealed the issue he would have won, *Belford v. United States,* 975 F.2d 310, 314 (7th Cir.1992), and this is a sufficient showing of prejudice under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

*Id.*

The court then excused Mr. Brumley's procedural default on two grounds. It concluded that Mr. Brumley's appellate counsel had rendered constitutionally ineffective assistance because he had failed to raise a "significant and obvious" claim that might have resulted in reversal on direct appeal, *id.* at *3, and had failed to advise the petitioner to file a state post-conviction petition, *id.* at *4. The court also held that the petitioner presented a sufficient showing of actual innocence as an alternate ground.

Because this court does not see how a reasonable juror, properly instructed that accountability requires conduct intended to facilitate the crimes, could find beyond a reasonable doubt on the evidence presented that Brumley did intend to facilitate the crimes, we are of the view that a case of actual innocence has been made out.

*Id.* at *5. On these bases the court issued the writ of habeas corpus.

## II

## DISCUSSION

The state challenges the district court's grant of the writ of habeas corpus on two grounds. It submits that the district court erred in holding that Mr. Brumley's procedural default was excused by an adequate showing of cause and prejudice. It also contends that, because there was sufficient evidence to sustain Mr. Brumley's convictions, the district court erred in granting the writ. In this latter regard, it asserts that the court failed to apply properly the standard of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). More specifically, the state contends that the court failed to view the evidence and the reasonable inferences from that evidence in the light most favorable to the government.

In order to justify his procedural default in the state courts, Mr. Brumley attempts to show the requisite "cause and prejudice" by demonstrating that he was denied the effective assistance of counsel. To establish such a deprivation, he must meet the now-familiar test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). It is necessary under this test for the petitioner to demonstrate that his trial counsel's performance was constitutionally deficient and that the deficient performance resulted in prejudice to the petitioner. *Id.* at 687, 104 S.Ct. at 2064. Our case law makes it clear that, in ascertaining whether this standard has been met, a habeas court may focus on either prong of this test, as the efficient dispatch of judicial business dictates. *Milone v. Camp,* 22 F.3d 693, 703 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 720, 130 L.Ed.2d 626 (1995); *Cross v. DeRobertis,* 811 F.2d 1008, 1013 (7th

Cir.1987), *cert. denied,* 498 U.S. 842, 111 S.Ct. 122, 112 L.Ed.2d 91 (1990).[8]

In his attempt to meet the test of *Strickland,* Mr. Brumley asserted that his appellate counsel failed to present a significant and obvious issue, i.e., sufficiency of the evidence, on appeal. The district court looked first at the merits of Mr. Brumley's claim and concluded that Mr. Brumley was merely present and did nothing to assist the other defendants in the crimes. It concluded that "the failure of Brumley's appellate counsel to raise the insufficiency of the evidence on his appeal was a failure to raise a point that could well have resulted in the reversal of his conviction." *Brumley,* 1995 WL 382492, at *2. Following the methodology that we approved in *Cross,* we shall address initially the merits of Mr. Brumley's contention.

### A.

■ When we review a district court's grant of a writ of habeas corpus that was based on the insufficiency of the evidence, we evaluate the record under the standard established by the Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

> The relevant inquiry for a federal habeas court reviewing a sufficiency of evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Lemons v. O'Sullivan,* 54 F.3d 357, 364 (7th Cir.) (quoting *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789), *cert. denied,* — U.S. —, 116 S.Ct. 528, 133 L.Ed.2d 434 (1995). The *Jackson* Court elucidated the limited nature of this collateral challenge to the sufficiency of the evidence:

> Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be

considered in the light most favorable to the prosecution.

*Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original). In light of that standard, the prosecution need not exclude, in a habeas proceeding, every reasonable hypothesis of innocence. *Id.* at 326, 99 S.Ct. at 2792–93; *cf. Garlington v. O'Leary,* 879 F.2d 277, 285 (7th Cir.1989).

As we shall discuss more fully in the following paragraphs, our review of the record convinces us that the district court erred in granting the writ. In our view, the district court did not apply correctly the standard set forth by the Supreme Court in *Jackson.* We also believe the court misapplied Illinois' theory of criminal accountability by requiring proof of an affirmative act by Mr. Brumley to evidence his intent to facilitate the crime.

### B.

■ We begin our analysis by looking to the applicable state law for the essential elements of the crime of conviction. *Fagan v. Washington,* 942 F.2d 1155, 1158 (7th Cir. 1991). Mr. Brumley was convicted of murder, robbery and kidnapping under Illinois' theory of accountability. Under this theory, a person is criminally responsible for the conduct of another if he aids, or attempts to aid, another person in the commission of a crime with the intent to facilitate the commission of that crime. 720 ILCS 5/5–2(c).[9]

The district court was of the view that the evidence in this case reflected only that Mr. Brumley was present at the scene and that "under Illinois law this is insufficient for criminal accountability, even when coupled with flight." *Brumley,* 1995 WL 382492, at *1 (citing *Reid,* 143 Ill.Dec. at 255, 554 N.E.2d at 190). The court interpreted the Illinois cases on the law of criminal accountability to require "some affirmative act by the defendant by which he evidences an intent to facilitate the crime." *Id.* at *2. On appeal, Mr. Brumley submits that the district court's view of the law of Illinois was correct and

---

**8.** *See, e.g., Kavanagh v. Berge,* 73 F.3d 733, 735 (7th Cir.1996) (reviewing the performance prong of the *Strickland* test); *United States v. Pratt,* 52 F.3d 671, 675 (7th Cir.) (focusing on the preju-

dice prong), *cert. denied,* — U.S. —, 116 S.Ct. 216, 133 L.Ed.2d 147 (1995).

**9.** *See supra* note 1 for the text of the statute.

that "passive" conduct cannot support a conviction under the accountability rule.

■ We find ourselves in respectful disagreement with the district court; we cannot accept entirely its articulation of the governing legal principles. Of central importance is the Illinois Supreme Court's inclusion, among the axioms of the accountability doctrine, the rule that "active participation has never been a requirement for the imposition of criminal guilt under an accountability theory." *People v. Taylor*, 164 Ill.2d 131, 207 Ill.Dec. 1, 5, 646 N.E.2d 567, 571 (1995); *see also Reid*, 143 Ill.Dec. at 255, 554 N.E.2d at 190; *People v. Ruiz*, 94 Ill.2d 245, 68 Ill.Dec. 890, 447 N.E.2d 148 (1982), *cert. denied*, 462 U.S. 1112, 103 S.Ct. 2465, 77 L.Ed.2d 1341 (1983). Elaborating further on that statement, the *Taylor* court continued: "One may aid and abet without actively participating in the overt act." *Taylor*, 207 Ill.Dec. at 5, 646 N.E.2d at 571. Thus, the appellate courts have explained, "when the defendant either actively or passively participates in the commission of the offense," he satisfies the "conduct" or "participation" prong of the accountability theory. *People v. Banks*, 260 Ill. App.3d 464, 198 Ill.Dec. 198, 203, 632 N.E.2d 257, 262 (1994); *see also People v. Mischke*, 278 Ill.App.3d 252, 214 Ill.Dec. 876, 883–84, 662 N.E.2d 442, 449–50 (1995); *People v. Williams*, 262 Ill.App.3d 734, 200 Ill.Dec. 442, 448, 635 N.E.2d 781, 787 (1994).

■ As the district court noted, under *Reid*, proof of accountability requires more than consent to the commission of a crime; more than knowledge of the commission of a crime; and more than presence at the scene of a crime, even when coupled with flight from the scene. *Reid*, 143 Ill.Dec. at 255, 554 N.E.2d at 190. *Reid* also counsels, however, that, when an accused person was "present at the commission of the crime without disapproving or opposing it," the trier of fact ought to assess that presence in connection with the other circumstances of the case. It must be determined whether the

> person assented to the commission of the crime, lent to it his countenance and approval and was thereby aiding and abetting the crime.... Stated differently, circumstances may show there is a common

design to do an unlawful act to which all assent, and whatever is done in furtherance of the design is the act of all, making each person guilty of the crime.

*Id.* at 255, 554 N.E.2d at 190 (quoting *People v. Morgan*, 67 Ill.2d 1, 7 Ill.Dec. 69, 73, 364 N.E.2d 56, 60, *cert. denied*, 434 U.S. 927, 98 S.Ct. 411, 54 L.Ed.2d 287 (1977)).

■ Five years after *Reid*, the Supreme Court of Illinois revisited this concept in *Taylor* and again focused on the factors that the trier of fact may consider in determining whether a defendant shared the criminal intent of the principal and whether there was a common criminal plan, purpose or design that can be seen or inferred from the circumstances. *Taylor* suggests that the trier of fact consider whether the defendant: (1) was present during the perpetration of the crime; (2) maintained a close affiliation with his companions after the commission of the crime; (3) failed to report the crime; (4) fled from the scene; and (5) voluntarily attached himself to a group bent on illegal acts with knowledge of its design. *Taylor*, 207 Ill.Dec. at 5–6, 646 N.E.2d at 571–72.

### C.

We now apply the accountability analysis of *Reid* and *Taylor* to the facts of this case.

The district court, after concluding that the evidence reflected Mr. Brumley's mere presence at the scene and nothing more, stated that it was "unable to see how the result could have been anything other than a reversal." *Brumley*, 1995 WL 382492, at *2.

Here, Brumley was merely present and did nothing to assist the other defendants. As far as Brumley's conviction for kidnapping is concerned, there is no evidence that he was even present when the victim was kidnapped. The only evidence in the case is to the effect that the victim was already "balled up" on the floor of the car when Brumley entered the car and first saw him. Although Brumley was "present" at the robbery and the murder, it is perhaps more accurate to say that he was nearby, sitting in the car, when the money was obtained at the currency exchange and later when he heard a shot while one of the

other defendants was standing over the victim in a vacant lot. There is no evidence that he did anything to assist either the robbery or the murder. Had he never entered the car that day, there is no reason to believe the robbery and the murder would not have occurred just as they did. *Id.* We respectfully disagree with that conclusion. When we view the evidence in the light most favorable to the prosecution, as a habeas court must do, and evaluate the evidence under the *Taylor* factors listed above, we must conclude that there was sufficient evidence for a rational trier of fact to find Mr. Brumley guilty of the crimes under an accountability theory. The district court deduced from the record another interpretation of what happened on the evening of June 13, 1986, one consistent with Mr. Brumley's explanation. In so doing, however, the district court "ignore[d] the requirement that, on habeas review of the sufficiency of the evidence, the evidence presented must be viewed in the light most favorable to the prosecution." *Garlington,* 879 F.2d at 285; *see Lemons,* 54 F.3d at 364; *Kines v. Godinez,* 7 F.3d 674, 677 (7th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1314, 127 L.Ed.2d 664 (1994).

The defendant admitted to four of the five factors listed in *Taylor,* and a rational juror could reasonably infer that Mr. Brumley maintained a close affiliation with his companions after the crime.[10] Consider the undisputed facts: Mr. Brumley got in the car with Anderson and Gray, knowing it was not their car, and voluntarily stayed in the car. He saw the "white man balled up" on the floor of the car and realized that the man was frightened. He knew that one of the codefendants had a gun and that one of them stated that the victim was going to give them some money. Mr. Brumley remained in the car, with the engine running, for perhaps ten minutes, while the others were in the currency exchange. He knew the other two men were trying to decide what to do with the victim, and he heard the victim beg for his life. Yet he continued with them to the place where the victim would be killed and re-

mained with the group, looking around to see if anyone else was coming. After the victim was shot in the head, Mr. Brumley saw Anderson standing over the victim with a gun. He and the other two fled from the scene in different directions. He never reported the crimes to the police.

From these facts, rational jurors could reasonably infer that Mr. Brumley knew that the crimes were being committed and, based on his conduct during and following the commission of the crimes, that he assented to and aided in their commission. Mr. Brumley's intentional participation in these crimes can be inferred from his voluntary presence during their commission; his failure to disassociate himself from the commission of the crimes, notwithstanding such opportunities as his period alone in the car at the currency exchange or at stops made during the long evening of driving around; his flight after the victim was murdered; and his failure to report the crimes during the period of more than one year that elapsed before he was arrested. Mr. Brumley's participation in the crimes can further be inferred from the inculpatory comment "I thought we got away with it," tr. 529, that he made to the Assistant State's Attorney after making his statement. Had the district court taken the perspective required, it would have taken account that the jury was entitled to place great weight on Mr. Brumley's admission that he voluntarily joined Gray and Anderson in the victim's car; that he sat in the back seat with Mr. Cypin, in a position to supervise or control the victim's movements; that he was unflinchingly present while Mr. Cypin was being held, robbed and murdered; that he stayed in the "getaway" car with the engine running at the currency exchange; and that he was looking around, just as a lookout would, at the scene of the murder. Viewing this evidence, along with other facts, in the light most favorable to the state, a rational factfinder reasonably could have inferred from the evidence that Mr. Brumley was criminally accountable for the crimes. We must conclude that the dis-

---

**10.** That reasonable inference could be drawn from Willie McCoy's testimony that Brumley, Anderson and Gray worked with him at the car wash, lived in the same neighborhood and hung around the same street corner, and yet Mr. Brumley never reported the crimes.

trict court's failure to view the evidence in the light most favorable to the state was error.

We hold, therefore, that the district court mischaracterized Mr. Brumley's conduct as entirely passive. It is clear to us that the evidence, when viewed in the light most favorable to the prosecution, permits a reasonable inference that Mr. Brumley was part of a common scheme to commit one or more of the crimes. *See, e.g., People v. McClain,* 269 Ill.App.3d 500, 206 Ill.Dec. 580, 584, 645 N.E.2d 585, 589 (1995) ("A defendant will be accountable for crimes of the principal even if the defendant's intended participation in the common design is to aid the principal in only one offense, and not to aid the principal in other crimes committed by the principal in furtherance of the planned or intended act.... [F]or purposes of determining legal accountability, the crime is not completed until the offender has escaped from the scene."). Now that we have applied the analysis of criminal accountability set forth in *Reid* and *Taylor* to the facts in this case, viewing the evidence in the government's favor, we hold that the district court's conclusion that Mr. Brumley was "merely present," like a bystander, cannot stand.

■ There is another reason for concluding that the district court erred in ruling that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. At closing argument, defense counsel offered a theory of defense that the jury clearly had the right to accept or to reject. Counsel claimed that none of the evidence indicated that Mr. Brumley was responsible or accountable for anything that happened. He then asserted that the police

had tricked Mr. Brumley into making a statement as a government witness by "parroting what the police [had] been telling him for 19 hours." [11] Tr. 643. The defense attorney opined that Vincent Brumley was never in Mr. Cypin's car on June 13, 1986, and that Mr. Brumley truthfully had no knowledge of the crimes committed that day.[12] Although he was unable to explain why the police would "go to all this trouble to try to trick, to try to rope Vince Brumley into this," tr. 649, defense counsel insisted that the police did so. He also argued that the State's Attorney practiced the story with Mr. Brumley several times until "they have down a script that they believe is going to be the most incriminating thing they can get Vincent Brumley to say." Tr. 651. In other words, defense counsel's closing argument urged the jury to believe that the police and State's Attorney concocted this story and "roped" Mr. Brumley into telling it. Such a straightforward credibility issue is one for the jury to resolve. *Bergmann v. McCaughtry,* 65 F.3d 1372, 1378 (7th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 1552, 134 L.Ed.2d 654 (1996). The jury's choice not to believe Mr. Brumley's version of the events was reasonable, in light of the evidence presented at trial.

## Conclusion

Viewed in the light most favorable to the prosecution, the evidence supports the jury's verdicts. We hold that the evidence establishing that petitioner Vincent Brumley was guilty of aggravated kidnapping, armed robbery and murder based on an accountability theory was sufficient to prove him guilty beyond a reasonable doubt. We therefore

11. The state objected to defense counsel's argument on the ground that there was no evidence of trickery by the police. The court admonished the jurors that closing arguments are arguments rather than evidence, and that they had heard the evidence and should draw reasonable inferences from the evidence itself. Tr. 640. We note that no claim of police coercion was raised in this appeal.

12. Counsel for Mr. Brumley pointed out inconsistencies between his client's statement and the testimony of various witnesses. For example, Mr. Brumley stated that, after the shot was fired,

the white man fell and hit the ground. Defense counsel reviewed the testimony of the forensic experts; it indicated that Mr. Cypin was shot lying on the ground. Thus, concluded the defense attorney, Mr. Brumley could not have seen him fall. He also points to the confusion shown by Mr. Brumley when asked if he saw Steve holding the gun: "Yes. He had to. I guess." Tr. 648. Mr. Brumley's attorney argued then that "They are the kind of answers that come out of someone who is trying to construct his witness statement according to what the police have been telling him for 19 hours." *Id.*

reverse the district court's judgment granting the petition for writ of habeas corpus.

REVERSED.